IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| IRON THUNDERHORSE | § | |
| v. | § | CIVIL ACTION NO.  9:04cv222 |
| BILL PIERCE, ET AL. | § | |

MEMORANDUM OPINION AND
PARTIAL ORDER OF DISMISSAL
OF DEFENDANTS BRAD LIVINGSTON AND BILL PIERCE

The Plaintiff Iron Thunderhorse, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se,* filed this lawsuit under 42 U.S.C. §1983 and other federal laws complaining of alleged violations of his constitutional rights.  The lawsuit has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

Thunderhorse's original and amended complaints center around the issue of religious freedom.   After an extensive discussion of his long history fighting TDCJ-CID in court, Thunderhorse explains that he is a practitioner of Native American religion and refers to himself as a "shaman."  He states that the Native American religious program existing in TDCJ-CID, as it now stands, gives preferential treatment to "Christian-oriented" Native American beliefs while "disfavoring and excluding" traditionalist Native American ceremonial leaders known as shamans. He says that the Native American program fails to inform interested persons, including himself, what the program entails and what items are allowed to be possessed before the interested inmate submits an I-60 inmate request form declaring a religious preference.   Thunderhorse says that this is discriminatory because "mainstream Christians" are informed and know what to expect. Furthermore, he asserts, Native American programs within the prison are restricted to certain units,

1

and inmates in administrative segregation are restricted from participating in the programs. Thunderhorse himself is in administrative segregation, as a result of a disciplinary case which he received for assaulting an officer.

Next, Thunderhorse says that the current TDCJ-CID policy setting out Native American "holy days" is not neutral, but favors Plains Indians culture and excludes other regions. He says that he requested a fair resolution in which one holy day for each of the seven cultural regions would be adopted, but that the Defendant Bill Pierce told him it was up to then-chaplain Ron Teel, and Teel said that only Pierce could approve it.

Thunderhorse reiterates that the restriction of Native American programs to only certain units violates the Establishment Clause. He stated that he had been allowed a viable program while confined at the Stiles Unit, and to deny him one, at the Polunsky Unit, violates his right to practice his religion.

Thunderhorse goes on to say that TDCJ-CID "maintains a separate category" for shamanism, the practitioners of which are entitled to "nothing." He says that he is an "acknowledged shaman, equivalent to a priest and ceremonial leader," and that he has been listed as a shaman on his prison travel card since 1978, but that TDCJ-CID's failure to develop a set of shamans' items and procedures is proof that the prison system has tried to get him to convert to its "Christian-Indian program" or do without.

Although the TDCJ policy on religious devotional items claims the availability of such items as feathers, headbands, medicine bag, and natural objects such as stones, shells, feathers, bone, tooth, and plants, Thunderhorse says, this is not done in practice. He says that he used to have several multi-colored headbands, but that a new policy restricts these headbands to white only. Thunderhorse states that he asked for a copy of this new policy, but it has not been given to him. Thunderhorse contends that the Muslims are allowed to have multi-colored headgear, so the fact that he is not is discriminatory.

Thunderhorse states that medicine bags must come from an approved vendor.  He says that this is "sacrilegious" because medicine bags are to be handled only by shamans and medicine men, not vendors.  Thunderhorse adds that the allowance of natural objects, kept in medicine bags, is left to the whims of unit wardens.  He says that he had a quartz crystal in his medicine bag since the 1980s, but it was confiscated by Warden Alford who determined, by only  visual inspection, that it was just "a hunk of plastic."  Furthermore, Thunderhorse says, by policy medicine bags must be worn only in cells or to and from ceremonies, but that he wants to wear his medicine bag everywhere because "to remove it is to court death."

Thunderhorse complains that the TDCJ Religious Program Committee is staffed by Christian chaplains, and there are no Native American traditional elders or shamans on the committee.  He states that the Native American program, which he again complains is located only on certain units, gets only occasional ceremonies, as opposed to "frequent services" for mainstream religions.  He says that Shamans and Native American circle members are not allowed any feast days or celebrations, while mainstream religious groups have celebrations "on a weekly basis."  He points to such things as Bill Glass Ministry Revivals, Mike Barber Ministry Revivals, and KAIROS celebrations, which present everything from magicians to singing groups, motorcycle displays, comedians, and martial arts exhibits, which he claims have "nothing to do" with religious issues.  Thunderhorse says that he has formally suggested a plan allowing quarterly feast days celebrating the seasons, but to no avail.

Next, Thunderhorse says that Muslims, Orthodox Jews, and Orthodox Greeks in TDCJ are allowed special diets and foods in conjunction with holy day observances, but no such privileges are allowed for Native Americans.  He says that it is an "ancient tradition" to celebrate the four seasons with feasts including special foods.  Thunderhorse's complaint does not identify the special diet or foods which he is seeking.

Thunderhorse says that he is the person most responsible for the existence of a Native American program in TDCJ-CID, but that he is excluded from the program because the defendants

3

have refused to develop "a similar but unique category" for shamans, and because TDCJ has created a "Christian-oriented program" to the exclusion of traditionalist shamans such as himself.  He says that he is a "traditionalist Algonquian shaman" and as such has sacred duties, obligations, and responsibilities to perform for his clan, nation, and confederacy, which he does not specify; in any event, Thunderhorse says, these duties have all been "chilled" since 2004.  He says that the "shift" in TDCJ policies away from the three previous agreements which he says that he made with prison officials places a substantial burden on his "exercise of ancient traditions."

Between 2004 and 2005, Thunderhorse says, all of the sacred items allowed for him during the past decade have been confiscated or destroyed or forced to be sent home, due to "vague and ambiguous changes and interpretations" which served as "official excuses to discriminate and retaliate."  He says that he has been subjected to acts of discrimination and retaliation, including: repeated disciplinary cases for violating grooming standards; harm and threats of harm by use of tear gas; destruction of handicap aids such as glasses and UV shields; and placement in administrative segregation.  He says that he has submitted several proposals for informal resolution, which were all ignored.  He claims that he has suffered a denial of medical care and the discontinuance of medical passes.

Thunderhorse states that while some common intertribal beliefs do exist, a majority of Native American beliefs differ significantly between cultural regions.  He says that mainstream Christian religions differ significantly on many issues, but that they are not forced to worship together en masse.

Thunderhorse adds that TDCJ-CID policies now in existence represent a departure from prior accommodations made to him in violation of various United Nations treaties, and also violate the treaty rights between the Algonquin Family of Nations as well as the International Indian Treaty Council's Declaration of the Spiritual Rights of Native American Prisoners.  He says that he is a "direct descendant" of an autonomous confederation which "helped America establish its entire democratic political system."

4

Thunderhorse goes on to say that he has requested an exemption to the TDCJ-CID grooming code under RLUIPA and in consideration of previous out-of-court settlements.  He says that he was never a security breach, even with long hair, because visual searches were possible and were done, and because TDCJ-CID had multiple photographs of him on file.  Thunderhorse argues that this distinguishes his case from Diaz v. Collins.

In summarizing his claims, Thunderhorse says that the key facts in his amended complaint are: (1) confiscation of religious items; (2) denial of religious items; (3) denial of programs for shamans; (4) denial of a racial category for "Native Americans"; (5) failure to provide exemptions or accommodations for the dress code and grooming code; (6) failure to allow equal access to services for inmates in segregation; and (7) failure to honor prior agreements which he entered into with prison officials.  He adds that TDCJ-CID's grooming policy deprives him of a RLUIPA-approved hair style and says that the prison's racial categorization system recognizes only Caucasian, Hispanic, and Negro races, excluding Native Americans.  He says that this deprives him of unspecified benefits he would otherwise have enjoyed.

Finally, Thunderhorse lists his causes of action as follows: (1) TDCJ-CID's actions violate the Free Exercise Clause by placing a substantial burden on his religious beliefs and practices as a Native American shaman; (2) TDCJ-CID's actions violate the Establishment Clause because they cater to "mainstream religions" and deprive Thunderhorse and others of feast-day celebrations and dietary foods which members of other faiths get; (3) TDCJ-CID's actions violate the Equal Protection Clause by failing to develop a racial category for Native Americans, causing him to lose rights such as cell assignment based on race; (4) TDCJ-CID's actions violate the Establishment Clause by depriving him of certain devotional items, including traditional hairstyle, while members of other faiths are not so deprived; and (5) TDCJ-CID's policies are unconstitutional because they violate sovereign and autonomous cultural integrity of Thunderhorse and the would-be intervenors as a tribal confederation with 501(c)(3) status, violating Article I(3) and Section 8(3) of the Constitution as well as Article VI(2), relating to Indian treaties.

5

<u>The Motion for Summary Judgment by Livingston and Pierce</u>

The defendants Brad Livingston and Bill Pierce filed their motion for summary judgment on January 5, 2006.[1]  In this motion, they argue first that Thunderhorse lacks a viable claim under the Equal Protection Clause.  The Defendants say that Thunderhorse's contention that the TDCJ-CID Native American program fails to inform participants what it entails and what items are allowed is incorrect, because TDCJ-CID policy sets out what items inmates may have and inmates may change their faith preference once per year.  *See* TDCJ-CID Administrative Directive 07.30; TDCJ-CID Chaplaincy Manual, Policy 11.11

The Defendants further say that Thunderhorse's contention that the list of holy days is not "neutral" because it favors Plains Indian culture is not correct.  They say that there are four holy days for Native Americans – the Day of Remembrance/Trail of Tears, Greasy Grass/Little Big Horn, Stone Creek, and the Historic Day of Prayer.  They point out that Thunderhorse is in administrative segregation and so cannot attend religious ceremonies in any event.  In addition, the Defendants contend that Thunderhorse has not shown that the designation of these days is discriminatory, due to the difficulty in describing what is "native American religion" and the lack of defined holy days.  They quote from a law review article entitled "Sacred Standards: Honoring the Establishment Clause in Protecting Native American Sacred Sites," as follows:

> [I]t is difficult to describe one Native American religion, because Native Americans identity themselves by tribe, and many beliefs differ by tribe. Native American religions reflect traditions that have existed in the Americas for over 30,000 years and a rich plurality of religions have evolved.  Similarly, there are many Christian denominations in America, though generalities can be stated.  Second, Native Americans typically view religion more in terms of culture than in terms of what most Americans would consider religion.  Notably, no traditional Native American language has one word that could translate to "religion."  For Native Americans, the spiritual life is not separate from the secular life.  Native Americans do not honor Sabbath days, and they generally do not extend special religions significance to particular days of the year.

---

1The defendant Ron Teel filed a separate motion for summary judgment, which shall be addressed by separate order.

Anastasia Winslow, "Sacred Standards: Honoring the Establishment Clause in Protecting Native American Sacred Sites," 38 Ariz. Law Rev. 1291, 1294-95 (1996).

Similarly, the Defendants observe that the Federal Bureau of Prisons has established September 24 and 25 as holy days for American Indian prisoners; the Bureau says that because there are so many different tribes, and each tribe observes holy days which have religious significance for its members, it is "difficult to find common ground" in establishing religious holy days.   The Defendants also note that Thunderhorse himself wrote a letter to Pierce saying that different tribes have different holy days.  Under TDCJ-CID policy, the Defendants say, inmates may request a holy day, allowing an opportunity for accommodation of members of individual tribes with specific requests.  For this reason, the Defendants say, Thunderhorse's contention that the list of holy days "favors Plains Indians culture" fails to show an Establishment Clause violation because TDCJ-CID must rely on experts to establish holy days.  Furthermore, they state, inmates from other Native American cultures, like inmates of other faiths, may request holy days more in keeping with their own cultures and traditions.

Next, the Defendants maintain that the fact that only certain units offer Native American programs is not the result of discrimination, but the lack of available volunteers.  The Defendants state that other faiths which suffer from a lack of volunteers have the same constrictions.  In addition, the Defendants note that the fact that inmates in administrative segregation cannot attend ceremonies is common to segregated inmates of all faiths and is not indicative of discrimination.

The Defendants' motion for summary judgment then reviews the existing legal authorities.  They state that under O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987), prison regulations, even those affecting religious faiths, are to be upheld by the courts when these regulations are reasonably related to a legitimate penological interest.  In passing the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §2000c-1(a) *et seq.*, (RLUIPA), Congress modified the O'Lone test to provide that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution even if the burden results from a rule of general applicability,

unless the government demonstrates that the imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling interest.

The Defendants acknowledge that this statute imposes a strict scrutiny test upon prison regulations, but point out that in Cutter v. Wilkinson, 125 S.Ct. 2113 (2005), the Supreme Court observed that courts are to apply this test with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources." They add that the Court also pointed out that lawmakers supporting the Act were mindful of the urgency of discipline, order, safety, and security in penal institutions, and that 'context matters' in the application of the standards. Cutter, 125 S.Ct. at 2122-25. The Court found that prison security was a "compelling governmental interest" and that deference was due to institutional officials' expertise in this area.

According to the Defendants, the burden falls first upon the Plaintiff to demonstrate that the government practice complained of imposes a "substantial burden" under RLUIPA, which requires that two questions be answered: whether the burdened activity is a religious exercise and if the burden is substantial. They quote the Fifth Circuit as saying that a government action or regulation creates a "substantial burden" if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs; however, a government action or regulation is not a substantial burden if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way not otherwise generally allowed. Adkins v. Kaspar, 393 F.3d 559, 567 (5th Cir. 2004). .

The Defendants contend that Thunderhorse's argument about his hair has been rejected by the Fifth Circuit and by this Court. See Diaz v. Collins, 114 F.3d 69, 73 (5th Cir. 1997). In that case, the Fifth Circuit held that TDCJ-CID's regulations on hair length were related to security and involved a compelling governmental interest. Although that case was brought under the Religious

8

Freedom Restoration Act of 1993 (RFRA) rather than the Religious Land Use and Institutionalized Persons Act, the Supreme Court has held that RFRA adopted and used the same heightened scrutiny standard as does RLUIPA. The Eastern District of Texas has also recently concluded that the TDCJ-CID grooming code furthers the compelling governmental interest of security and does so by the least restrictive means. <u>Gooden v. Crain</u>, — F.Supp.2d —, civil action no. 6:04cv127 (E.D.Tex., December 13, 2005) (available on WESTLAW at 2005 WL 3436769). Consequently, the Defendants argue that Thunderhorse's challenges to the TDCJ-CID grooming code must also fail.

The next claim addressed by the Defendants is Thunderhorse's complaint that he is only allowed to possess a white headband and a medicine bag from an approved vendor. The Defendants agree that Thunderhorse is allowed to have a white headband, certain natural objects, and a medicine bag, which must be purchased from an approved vendor. The affidavit of Nathaniel Quarterman, Deputy Director for Prison and Jail Management for TDCJ, points out that TDCJ has a security concern regarding the presence of gangs, who often use clothing or insignia to identify members; for this reason, such items as Kufi caps worn by Muslims or medicine bags and headbands worn by Native Americans may only be worn inside of cells or during religious services. For the same reason, these items may be purchased only from approved vendors and must be of a uniform color.

Quarterman also stated that the prison space limitations necessarily require limits on the amount of personal property which an inmate may possess, and items such as large stones or crystals may be used as weapons. The Defendants thus argue that the regulations challenged by Thunderhorse implicate the compelling state interest of security and thus should be upheld.

With regard to the retaliation claim, the Defendants argue that Thunderhorse has not shown that the Defendants Livingston or Pierce had a role in any disciplinary action regarding the grooming code or a use of force. They point to an incident involving an officer named Mouton, allegedly injured by Thunderhorse in an altercation at the Polunsky Unit, which incident apparently caused Thunderhorse's placement in administrative segregation. Livingston and Pierce say that they are not assigned to the Polunsky Unit and any theory that they conspired with persons at the Polunsky

Unit is "too remote to establish causation."  More generally, the Defendants state that Thunderhorse has not and cannot allege a chronology of events from which retaliation may plausibly be inferred.

Finally, the Defendants assert their immunity from monetary damages.  However, Thunderhorse has disclaimed any monetary damages.

### The Response to Livingston and Pierce's Motion for Summary Judgment

In his response, Thunderhorse says that this lawsuit is a civil action brought primarily under RLUIPA as well as other sections of the Civil Rights Act, the Indian Rights Act, and the 1st and 14th Amendments.  Thunderhorse says that the prison has previously accommodated his needs, up until 2004.  Now, however, prison officials are violating his rights by denying him access to a personal sacred pipe and related implements, and not allowing specific items used routinely by shamans; by confiscating the items allowed to non-shamans which were destroyed or sent home as contraband; misrepresenting Native American faiths by developing policies and practices which include false statements and failing to develop a program that includes adherents of aboriginal tenets recommended by the Native American Task Force; by working with "pro-Christian adherents," and by failing to provide a religious diet and religious celebrations on a parity with mainstream religions.

He complains that the Defendants accommodate members of mainstream religions "to the exclusion of his faith" and refuse any items or programs for any type of shamanist faiths.  He says that there are no program activities in administrative segregation and complains that a scheduled visit with a spiritual advisor was not allowed. Thunderhorse again challenges the grooming standards and the fact that there is no racial category for "native Americans." He lists the substantial burdens to his faith as follows: (1) not allowing items to shamans; (2) catering to what he calls "native American Christians" to the exclusion of shamans by misrepresenting native American religious traditions as an "excuse to legitimize their state created substitute"; (3) refusing to provide religious diets and celebrations on parity with mainstream religions; (4) repeated disciplinary cases for not cutting hair; (5) failing to provide a racial category for native Americans; and (6) retaliation.

<u>Legal Standards and Analysis</u>

<u>Standards for Summary Judgment</u>

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.   <u>Securities and Exchange Commission v. Recile</u>, 10 F.3d 1093, 1097 (5th Cir. 1994); <u>General Electric Capital Corp. v. Southeastern Health Care, Inc.</u>, 950 F.2d 944, 948 (5th Cir. 1992); Rule 56(c), Fed. R. Civ. P.

To avoid summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning existence of every essential component of that party's case; unsubstantiated assertions of actual dispute will not suffice.  <u>Thomas v. Price</u>, 975 F.2d 231, 235 (5th Cir. 1992), *citing* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The Fifth Circuit has stated that once the moving party has met its burden, the nonmovant must direct the court's attention to admissible evidence in the record which demonstrates that it can satisfy a fair-minded jury that it is entitled to a verdict in its favor.  <u>ContiCommodity Services, Inc. v. Ragan</u>, 63 F.3d 438, 441 (5th Cir. 1995).

Summary judgment should be granted when the moving party presents evidence which negates any essential element of the opposing party's claim, including a showing that an essential element of the opposing party's claim is without factual support.  <u>First American Bank & Trust of Louisiana v. Texas Life Ins. Co.</u>, 10 F.3d 332, 334 (5th Cir. 1994).  The granting of summary judgment is proper if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  <u>Caldas & Sons v. Willingham</u>, 17 F.3d 123, 126 (5th Cir. 1994).  Once the movant makes this showing, the burden shifts to the non-movant to come forward with evidence sufficient to establish the existence of a genuine issue of material fact. <u>Caldas</u>, 17 F.3d at 126-27.

11

Although the Court must draw all inferences in favor of the party opposing the motion, an opposing party cannot establish a genuine issue of material fact by resting on the mere allegations of the pleadings.  Hulsey v. State of Texas, 929 F.2d 168, 170 (5th Cir. 1991); *see also* Gordon v. Watson, 622 F.2d 120 (5th Cir. 1980) (litigants may not oppose summary judgment through unsworn materials).  Similarly, a bald allegation of a factual dispute is insufficient, in itself, to create a genuine issue of material fact.  Recile, 10 F.3d at 1097 n.15.  A non-movant cannot manufacture a factual dispute by asking the Court to draw inferences contrary to the evidence.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In short, a properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show that a genuine factual issue exists.  Hulsey, 929 F.2d at 170, *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Review of Relevant Caselaw

The cases which primarily inform this Court's decision are Cutter v. Wilkinson, Adkins v. Kaspar, Freeman v. TDCJ-CID, 369 F.3d 854 (2004), and Diaz v. Collins, 114 F.3d 69 (5th Cir. 1997). In Cutter, members of various "non-mainstream" religions in the Ohio prison system brought suit under RLUIPA complaining that the prison officials failed to accommodate their religious exercises in various ways, including denying them access to religious literature, denying the same opportunities for group worship enjoyed by adherents of mainstream religious, forbidding them to adhere to dress and grooming requirements, withholding ceremonial objects substantially identical to those permitted to adherents of mainstream religions, and failing to provide chaplains trained in their faith.

In response, the prison officials mounted a facial challenge to RLUIPA, arguing *inter alia* that RLUIPA improperly advances religion in violation of the Establishment Clause.  The district court denied the defendants' motion to dismiss, but the Sixth Circuit reversed this decision, holding that RLUIPA violated the Establishment Clause by giving "greater protection to religious rights than to other constitutionally protected rights."  This decision was in turn reversed by the Supreme Court.

12

The Supreme Court began by tracing the history of congressional efforts to accord religious exercise heightened protection from government-imposed burdens.  Congress responded to the Court's decision in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990) by enacting the Religious Freedom Restoration Act (RFRA) of 1993.  The Court invalidated this law in City of Boerne v. Flores, 521 U.S. 507 (1997).  Congress then enacted the Religious Land Use and Institutionalized Persons Act.  This law provides that no state or local government shall impose a substantial burden upon a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and does so by the least restrictive means.  This standard was carried over from RFRA, but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators."  146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

In rejecting the Sixth Circuit's conclusion, the Supreme Court said first that RLUIPA is consistent with the Establishment Clause because it "alleviates exceptional government-created burdens on private religious exercise." Cutter, 125 S.Ct. at 2118.  The Court noted that individuals in institutions are dependent upon the government's permission and accommodation for exercise of their faith.

However, the Court then stated that "we do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."  The Court explained that while the Act adopts a "compelling governmental interest" standard, "context matters" in the application of this standard.  The Supreme Court said that lawmakers supporting RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions," quoting Sen. Hatch, and said that these lawmakers anticipated that courts would apply the Act's standard with "due deference to the expertise and experience of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of cost and limited resources." Cutter, 125 S.Ct. at 2123.

13

Finally, the Court concluded that should inmate requests for religious accommodations become excessive, impose unjustified burdens upon other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition. Cutter, 125 S.Ct. at 2125.

In Adkins v. Kaspar, inmate Donald Adkins was a member of a church called the Yahweh Evangelical Assembly.  He complained that he was not permitted to observe particular days of rest and worship, each Saturday for the Sabbath and certain holy days during the year.  A hearing pursuant to Flowers v. Phelps, 956 F.2d 488, *modified in part on other grounds* 964 F.2d 400 (5th Cir. 1992) was conducted by the district court.

At the hearing, YEA elder Jerry Healan testified that the church required adherents to meet together on each Sabbath and to make particular observances on specific holy days.  He said that he went to the prison unit approximately once a month to oversee Sabbath services, but that the distances involved made more frequent trips impracticable.  Healan stated that 25 to 30 inmates at Coffield attended the services.  Healan stated that he and Adkins corresponded regularly and that Adkins had authored several articles which were published in the YEA newsletter and on the Internet.  Healan also said that he had been allowed to come to Coffield and conduct a baptismal ceremony for Adkins and other inmates.

Adkins testified that he had been granted lay-ins for holy days and the Sabbath, but that he and other YEA members could not assemble and hold services on their own.  He stated that he and other YEA members had been allowed to attend tape sessions and listen to tapes sent by Healan, but that they could only do this on Mondays; tape sessions could not be conducted on Saturdays unless an accredited religious volunteer was present.

Leonard Sanchez, the senior chaplain at the Coffield Unit, testified that YEA members could congregate on the Sabbath if Healan was present (Healan was the only accredited volunteer for YEA), and that if Healan could come more frequently, arrangements would be made for YEA members to congregate, conditioned on availability of space and time.  Another couple, the

14

McEnanys, had not yet been accredited as YEA volunteers, but Sanchez said that when they were, they could lead YEA services on their own.

The district court concluded that the defendants had not denied Adkins a reasonable opportunity to practice his religion and that they had not burdened his religious exercise in violation of RLUIPA.  On appeal, the Fifth Circuit first examined Adkins' claim that TDCJ policies violated his right to free exercise of religion.

The Court reviewed the test of Turner v. Safley, 482 U.S. 78 (1987).  This case established a four-factor "rational relationship" test for analyzing the constitutionality of regulations that burden a prisoner's fundamental rights.  Under this test, courts must consider (1) whether a valid, rational connection exists between the prison regulations and the legitimate governmental interest put forth to justify it, (2) whether there exist alternative means of exercising the fundamental right which remain open to prison inmates, (3) what impact accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there is an absence of ready alternatives to the regulation in question.  Adkins, 393 F.3d at 564.

The Fifth Circuit noted that TDCJ's religious accommodation policy had been held to be rationally related to legitimate government objectives in Freeman v. TDCJ, 369 F.3d 854 (5th Cir. 2004).  In reviewing the second prong of the Turner test, the Fifth Circuit stated that the pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith.  In this regard, the Fifth Circuit stated that Adkins had access to religious materials, he and other YEA inmates were not required to work on the Sabbath, video and audio tapes were made available to YEA inmates on Mondays, and YEA members were permitted to hold services when Healan was able to attend.  The Fifth Circuit concluded that these accommodations were sufficient to accord Adkins and other YEA members alternative means to exercise their faith.

15

Next, the Fifth Circuit turned to the question of the impact which accommodation would have on guards, other inmates, and the allocation of resources generally.  The approximately 25 active members of YEA represented less than one percent of the population at the Coffield Unit; requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation" and have a negative impact on prison staff, inmates, and resources.  In addition, the Fifth Circuit said, if YEA were accommodated but other small religious groups were not, a perception of favoritism could arise which would have a negative impact on prison discipline and morale.

The Court concluded the discussion of Adkins' free exercise claim by stating that there was no obvious, easy alternative which would accommodate both Adkins' and TDCJ's needs.  Adkins' request, that YEA members be allowed to congregate on all Sabbaths and holy days without regard for the availability of qualified volunteers or adequate space and security was not an alternative which accommodated the prisoner's rights at *de minimis* cost to legitimate prison interests, and the chaplain testified that the Assembly could meet more often if volunteers could be present and time and space were available.

The Fifth Circuit then addressed Adkins' equal protection claim, saying first that the Constitution does not require that every religious group in prison, however small in number, have identical facilities or personnel.  The Court stated that every religious group at Coffield, except for Muslims who have a separate court order, must have outside volunteers present for meetings.  Hence, Adkins had failed to show any equal protection violation.

Adkins also complained that TDCJ's policies violated RLUIPA.  The Fifth Circuit held that in RLUIPA claims, the plaintiff first has the burden of demonstrating that the governmental practice imposes a "substantial burden" on his religious exercises.  This requires the court to answer two questions: (1) is the burdened activity a "religious exercise," and (2) if so, whether the burden is "substantial."

16

The Fifth Circuit acknowledged that the term "religious exercise" in RLUIPA means any exercise of religion, whether or not compelled by or central to a system of religious belief.  The exercise alleged to be burdened, which was the YEA Sabbath and holy day gatherings, was clearly a "religious exercise" under this definition, requiring review of the second question, whether or not the burden was "substantial."

In answering this question, the Fifth Circuit first noted that the term "substantial burden" was not defined in the statute, and different circuits had defined the term differently.  After reviewing the definitions adopted by the Seventh, Eighth, Ninth, and Eleventh Circuits, as well as pertinent Supreme Court decisions, the Fifth Circuit concluded that the proper definition was as follows:

> [F]or purposes of applying the RLUIPA in this circuit, a governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs.
>
> And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available non-trivial benefit, and, on the other hand, following his religious beliefs.
>
> On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

Adkins, 393 F.3d at 569-70.  The Court again emphasized that no test may require that the religious exercise be central to the adherent's belief system; however, the Court said, "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." In applying this test to Adkins, the Court said that the requirement that an outside volunteer lead worship services does not place a substantial burden upon Adkins' religious exercise, and therefore did not violate RLUIPA.  Adkins, 393 F.3d at 571.

17

In Freeman v. TDCJ, the plaintiff William Freeman joined the Church of Christ while in confinement at the Price Daniel Unit.  A chaplain named Wayne Horton, a Church of Christ Member, was assigned to that unit, but Freeman said that Horton's teachings departed from established Church of Christ doctrine.  Freeman filed a grievance complaining about Horton's performance and about a decision to reduce the two-hour church of Christ services to an hour and a half.  This grievance asked that elders from a local Church of Christ congregation oversee services, that incarcerated members be permitted to conduct services without Horton's interference, and that the services be restored to two hours.  This grievance was denied but the dispute continued, culminating in a walk-out by some 50 inmates from a service, for which Freeman received a disciplinary case and was transferred to a high-security unit.

Freeman filed a lawsuit and a class was certified.  This lawsuit complained that TDCJ was denying Church of Christ members an adequate opportunity to practice their faith.  The lawsuit sought an injunction ordering TDCJ to recognize the Church of Christ as a Christian religion separate and apart from other faiths, enjoin prison officials from violating Church of Christ members' right to worship, order prison officials to allow Church of Christ members to have an hour of separate worship time each Sunday according to tenets which the members believed essential to salvation, including a cappella singing and communion, order TDCJ officials to allow Church of Christ ministers and teachers from outside the prison to conduct individual Bible studies or assist with religious services, and order prison officials to allow these outside ministers and teachers to perform baptism by full immersion at an inmate's request.  Freeman also claimed that he individually was the victim of retaliation.

The evidence showed that TDCJ provides weekly religious services for what it considered to be the five major faith sub-groups within the prison.  These are Roman Catholic, Christian non-Catholic, Jewish, Muslim, and Native American.  The Church of Christ falls within the Christian non-Roman Catholic sub-group.

In addition, the evidence showed that supplemental devotional opportunities are offered for Church of Christ members.  In 41 TDCJ units, worship services are conducted by volunteers, who can often tailor the services to include a capella singing and communion; immersion baptism can be arranged for and performed by a Church of Christ minister at an inmate's request; and inmates may meet with an approved spiritual advisor twice a month.

The Fifth Circuit, applying the Turner test, concluded that TDCJ's policy was content-neutral and was rationally related to legitimate governmental objectives.  Specifically, the Court stated that staff and space limitations, as well as financial burdens, are valid penological interests.  The division of worship services into five major sub-groups was "eminently reasonable," and Church of Christ inmates also had alternative means to exercise their beliefs.  The Fifth Circuit rejected the view that if TDCJ offered Church of Christ services in 41 units, it must offer such services in all units, and also rejected the equal protection argument set out by the plaintiff class.

Finally, the Fifth Circuit rejected Freeman's retaliation claim, noting that Freeman had engaged in a public rebuke of Chaplain Horton and incited a walkout, which behavior was inconsistent with his status as a prisoner; consequently, punishment imposed for that behavior was not unconstitutional retaliation.

In Diaz v. Collins, the Fifth Circuit reviewed a case from the Eastern District of Texas decided in 1994.  The plaintiff Felipe Diaz expressed himself as a follower of Native American beliefs and said that he wished to worship in traditional ways, including the use of pipes, the keeping of a medicine pouch, a headband, and the wearing of long hair.  The district court observed that in April of 1994, TDCJ had instituted a new policy specifically addressing the needs of Native American adherents in the prison.  Under this directive, the Native American adherents could possess a headband, a shell, a medicine pouch, seven sacred stones, a feather, and such other objects as may be permitted by the unit warden and unit chaplain.  The inmates had access to ceremonial items such as drums, pipes, tobacco, a gourd, sage, sweetgrass, and cedar, which were made available to them by the chaplain as required.  The regulations stipulated that items must be ordered

19

from approved vendors, but stipulated that the medicine pouch could not be touched by any other person although it could only be worn in the cell.

The district court, after sketching the history of religious freedom in America, reviewed the Religious Freedom Restoration Act, the law in effect at that time.  The district court applied the Act to each of Diaz's claims in turn.

In so doing, the district court concluded first that TDCJ's hair regulations served the compelling governmental interest of security and were the least restrictive means available to further this interest.  Although Diaz complained that his religious beliefs did not allow him to obtain a medicine pouch from a commercial vendor, the evidence at trial showed that he would be permitted to obtain such a pouch from his spiritual advisor, but that the pouch had to be sent through the warden's office and that Diaz had to allow it to be visually inspected for contraband.  The district court concluded that these regulations, as well as the rule that Diaz could wear the pouch only in his cell, did not constitute a substantial burden on the exercise of his religion.

The evidence at trial showed that according to Glenda Taylor, who testified at Diaz's trial, the headband had more of a cultural than a religious significance.  Diaz stated that the headband continually reminds the wearer of his duties to the Creator, to fellow humans, to his family, his community and himself, and likened the headband to ceremonial headgear worn by some Christians, Jews, and Muslims.  The district court determined that headbands posed a potential security threat because of the possibility of concealing contraband, including weapons, and concluded that Diaz's rights were not violated by the requirement that he wear the headband only in his cell.  The district court therefore concluded that to the extent that the prison regulations inhibited the free exercise of religion, they did so in furtherance of a compelling governmental interest and were narrowly tailored to meet this purpose.  Diaz v. Collins, 872 F.Supp. 353 (E.D.Tex. 1994).

On appeal, the Fifth Circuit affirmed the district court's rulings on the medicine pouch and headband, explaining that Diaz had failed to prove that the prison regulations at issue substantially burdened his exercise of religion.  Because Diaz was confined in administrative segregation, he was

in his cell for some 22 hours per day, during which time he was allowed to wear his medicine pouch and headband.  The Fifth Circuit also upheld the district court's conclusion regarding Diaz's hair, affirming the finding that a prison regulation on hair length involves a compelling state interest and did not violate RFRA.

It should be noted in this regard that although RFRA has been struck down, the Supreme Court in Cutter observed that RLUIPA carried over the "compelling governmental interest/least restrictive means" test from RFRA.  Cutter, 125 S.Ct. at 2119.  Thus, cases interpreting RFRA are instructive with respect to RLUIPA.

<u>The Claims Raised by Thunderhorse</u>

With these cases and the summary judgment standards in mind, the Court will turn to the specific claims raised by Thunderhorse.  As set out in his amended complaint, these are:  (1) confiscation of religious items; (2) denial of religious items; (3) denial of programs for shamans; (4) denial of a racial category for "Native Americans"; (5) failure to provide exemptions or accommodations for the dress code and grooming code; (6) failure to allow equal access to services for inmates in segregation; and (7) failure to honor prior agreements which he entered into with prison officials.

<u>I & II. Confiscation and Denial of Religious Items</u>

Thunderhorse says that he used to have several multi-colored headbands, but a new policy restricts these headbands to white only.  He asked for a copy of the policy but none has been provided.  He says that the Muslims are allowed to have multi-colored headgear so this is discriminatory.

Thus, the evidence shows that Thunderhorse is not prohibited from having a headband, but merely from having a multi-colored one as opposed to a white one.  A review of the summary judgment evidence, including Thunderhorse's pleadings, fails to show that the provision of a white headband rather than a multi-colored one influences Thunderhorse to act in a way that violates his religious beliefs, or forces him to choose between enjoying some generally available non-trivial

benefit or following his religious beliefs.  *See* <u>Adkins</u>, 393 F.3d at 570.  Instead, it appears that, as the Defendants argue, this regulation merely prevents Thunderhorse from enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.  As such, this regulation does not substantially burden Thunderhorse's exercise of his religious freedom. This claim is without merit.

Thunderhorse refers to an incident in which a warden confiscated a quartz crystal upon determination that the item was simply a piece of plastic.[2]  He says that he had possessed this crystal for a number of years, and had a photograph of himself with the crystal around his neck.  However, none of Thunderhorse's pleadings indicate that confiscation of the crystal amounted to a substantial burden upon his religious faith, nor that this confiscation was done in accordance with TDCJ-CID policy.  As noted above, policy allows inmates to keep seven sacred stones, among other natural objects.  This claim appears to be one for the random and unauthorized confiscation of personal property.

The doctrine of <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy.  *See* <u>Caine v. Hardy</u>, 943 F.2d 1406, 1412 (5th Cir. 1991).  Three predeprivation conditions must exist before the doctrine can be applied.  These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized.  Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process.  <u>Charbonnet v. Lee</u>, 951 F.2d 638, 642 (5th Cir. 1992), *citing* <u>Zinermon v. Burch</u>, 494 U.S. 113 (1990); <u>Myers v. Klevenhagen</u>, 97 F.3d 91, 94-95 (5th Cir. 1996).

_____

[2]Thunderhorse does not make clear if this was an accurate determination.

Hudson holds that deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists.  Hudson, 468 U.S. at 533.  The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy.  Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); see also Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994).  Thus, the appropriate forum for this claim lies in state court or in the administrative procedures of TDCJ rather than federal court.  Simmons v. Poppell, 837 F.2d 1243 (5th Cir. 1987). Thunderhorse's claim on this point is without merit.[3]

Third, Thunderhorse complains that he must get his medicine bag from an "approved vendor," which he deems "sacrilegious." This same requirement was addressed in Diaz, and the Fifth Circuit concluded that the policy did not on its face violate the Constitution.  In that case, the prison representatives agreed that Diaz could obtain a medicine bag from a non-approved vendor provided that it was sent through the unit warden's office and that he allowed visual inspections of the bag. These requirements are reasonable and the Court anticipates that the prison officials in this case would permit Thunderhorse to obtain a medicine bag from a proper source under the same conditions.  With this understanding, the Court has determined that Thunderhorse's claim on this point is foreclosed by Diaz.

### III. Denial of Items to Shamans

Thunderhorse complains that TDCJ does not recognize "shamans," apparently as a sub-set of Native American religion.  Instead, he complains amorphously that TDCJ gives preferential treatment to "Christian-oriented" Native American beliefs while disfavoring and excluding traditionalist Native American ceremonial leaders known as shamans, including himself.  Although he repeatedly complains of the alleged preferential treatment given to "Christian-oriented Native American beliefs," he nowhere explains what this means; the TDCJ policies concerning Native

---

[3]In addition, the Court notes that while the size of the crystal is not specified, there is no question that a large stone (or piece of plastic) could putatively pose a security threat, particularly if, like many crystals, it was sharp or could be sharpened.

Americans make no mention of "Christian-oriented beliefs," and the accommodations made for Native American practitioners, including the medicine bags, sacred stones, natural objects, and tobacco ceremonies, do not appear consistent with a "Christian orientation."

Members of small religious groups must be afforded a reasonable opportunity to practice their faith, but need not be provided with facilities or personnel identical to those given to members of more populous denominations. *See* Kahey v. Jones, 836 F.2d 948, 951 (5th Cir. 1988). In this case, assuming that Thunderhorse's characterization of the Native American program in TDCJ is correct, it is not clear how many Native American religious adherents - already a very small group - would classify themselves as being within the sub-group known as shamans or shamanists, in which Thunderhorse identifies himself. In December of 2005, 2647 inmates, out of a prison population of 159,132, designated their religious preference as "Native American." This represents 1.66 percent of the prison population, which is very little more than the percentage of YEA adherents at the Coffield Unit in Adkins.

Thunderhorse himself asserts that there are numerous variations within the Native American religious tradition, corresponding to what he identifies as the seven North American linguistic branches. TDCJ cannot be expected to provide separate religious services for seven different branches of a religious faith having a total of 2647 members, nor does the law require that such be provided. Similarly, the prison officials cannot be expected to differentiate within these divisions between inmates following "shamanism" and those following "non-shamanisn." *Cf.* Orafan v. Goord, — F.Supp.2d —, slip op. no. 95-CV-318PAMGJD, 00-CV-2022PAMGJD (N.D.N.Y, January 17, 2006) (available on WESTLAW at 2006 WL 149050 (no violation of the constitutional rights of Shiite Muslim inmates for prison to offer only Sunni Muslim services). He has failed to plead any facts, much less offer any competent summary judgment evidence, showing that the accommodations for Native American religious adherents provided by the prison officials are geared toward "Christian-oriented beliefs;" instead, Thunderhorse relies upon conclusory assertions, which are not sufficient within the context of a Section 1983 case. Brinkmann v. Johnston, 793 F.2d 111,

113 (5th Cir. 1986). The fact that other religions, with far more adherents, have such events as Thunderhorse describes, including speakers, magicians, comedians, and martial arts exhibitions, does not show a violation of Thunderhorse's constitutional rights. *See* Kahey, 836 F.2d at 951.

Thunderhorse also complains that he has been denied access to "a sacred pipe." He does not make clear if he means that he is not allowed to possess one or he cannot take part in the Native American pipe ceremonies. In either event, Thunderhorse has failed to show that his constitutional rights have been violated; a pipe is not an item permitted for inmates' possession, given that tobacco is contraband within the prison, and Thunderhorse's classification in administrative segregation precludes him from attending pipe ceremonies for security reasons. He has not shown that this places a substantial burden upon his exercise of religious rights and his claim on this point is without merit.

In addition, it is apparent that Thunderhorse's claim in this regard is similar to that in Freeman, in which the Church of Christ plaintiffs complained that the general Christian non-Catholic service was not suitable for them; however, their claim that they were entitled to a wholly separate service was rejected by the Fifth Circuit. In the same manner, Thunderhorse appears to assert that the Native American programs which are offered are not suitable for his type of Native American faith because they are not geared toward "shamanism." However, Thunderhorse has failed to show that he does not have a reasonable opportunity to practice his faith. The competent summary judgment evidence shows that the lack of services congruent with Thunderhorse's beliefs is due to a lack of volunteers rather than any discriminatory purpose. As with Freeman, Thunderhorse's claims on this point are without merit.

In a similar vein, Thunderhorse complains that the TDCJ policy designating holy days for Native Americans are oriented toward the Plains Indian culture. As noted above, TDCJ cannot reasonably be expected to differentiate between the holy days for all of the branches of Native American religion. In addition, Thunderhorse has not shown that the fact that the holy days designated for Native Americans within TDCJ-CID are oriented towards Plains Indians places a

substantial burden upon his religious practice.  He is in administrative segregation and so does not require lay-ins from work, and inmates are permitted to request additional holy days if they desire. His claim on this point is without merit.

### IV. Denial of a Racial Category for Native Americans

Thunderhorse complains that TDCJ does not recognize "Native American" as a racial category, thus depriving him of benefits which he could otherwise obtain.  The prison officials respond that Thunderhorse could not benefit from such a category because the tribe in which he claims membership is not federally recognized.

The Quinnipiac Indians, the tribe in which Thunderhorse claims membership, is not federally recognized.   *See*   http://www.indians.org/Resource/FedTribes99/Region6/region6.   html; http://www.afn.org/~native/tribesl.htm#Q-R.   Some authors have voiced the opinion that the Quinnipiac ceased to exist as a distinct tribe during the first part of the 19th century.  *See* Townshend, The Quinnipiack Indians and their Reservation (pub. 1900); DeForest, History of the Indians of Connecticut (pub. 1851).  The website of the Algonquian Confederacy of the Quinnipiac Tribal Council, the organization of which Thunderhorse is Grand Sachem (leader), acknowledges that the Quinnipiac Bands split up in the late 18th century and that the last male Sachem died in 1770, but indicates that descendants of the Quinnipiac continued to live in the area, "hiding in plain sight."  While the Court has no reason to doubt this account of the tribal history, it should be noted that the Qunnipiac tribe does not even appear on lists of tribes which are not federally recognized, under that name or the name of the "New Haven Tribe of Indians."

The Defendants' argument appears to be that because the tribe in which Thunderhorse claims membership is not federally recognized, he has no basis upon which to claim that he would be entitled to benefits were Native American a racial category within TDCJ-CID.  This is not entirely accurate; certain benefits available to Native Americans are not conditioned upon being members of federally recognized tribes, most notably programs targeting under-represented minorities in

general.  *See generally* O'Brien, <u>Tribes and Indians: With Whom Does the United States Maintain a Relationship?</u>, 66 Notre Dame Law Review 1461 (1991).

In this case, however, Thunderhorse does not identify  any benefits of which he claims to have been deprived as a result of the fact that TDCJ-CID does not have a racial category for Native Americans.  His claim on this point is wholly conclusory and therefore without merit.  <u>Brinkmann</u>, 793 F.2d at 113.

V. Exemptions to the Dress Code and Grooming Code

To the extent that Thunderhorse complains that he cannot wear his headband or medicine pouch outside of his cell, this claim has already been addressed and is without merit.  Furthermore, as noted above, Thunderhorse's classification in administrative segregation, where he spends some 22 hours per day in his cell, largely vitiates this claim in any event.

The issue of hair is a major one in Thunderhorse's complaint.  He discusses the religious significance of long hair at some length in his complaint. While the significance of long hair in Native American culture is not disputed, however, established precedent runs contrary to Thunderhorse's claim.  The Fifth Circuit held in <u>Diaz</u> that prison regulations on hair length is related to security and as such involves a compelling state interest, which cannot be vindicated by any different or lesser means.  <u>Diaz</u>, 114 F.3d at 73.  More recently, this Court has held that hair regulations concerning beards did not violate the religious rights of Muslim inmates.  <u>Gooden v. Crain</u>, — F.Supp.2d — (E.D.Tex., Dec. 13, 2005).

In <u>Diaz</u>, the Fifth Circuit observed that according to the legislative history of RFRA, the courts should continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline.  <u>Diaz</u>, 114 F.3d at 73.  As noted above, essentially the same statement appears in the legislative history of RLUIPA.

Thunderhorse seeks to distinguish <u>Diaz</u> by saying that he was never a security breach, even with long hair, because visual searches were possible and were done, and because TDCJ-CID had

27

multiple photographs of him on file.  However, the issue at hand involves generally applicable regulations, not whether or not individual inmates represent potential breaches of security.  TDCJ-CID's generally applicable regulations governing hair length involve a compelling state interest which cannot be vitiated by any other means, and as such are constitutional.  <u>Diaz</u>, 114 F.3d at 73. Thunderhorse's claim on this point is without merit.

### VI. Access to Services for Inmates in Segregation

Thunderhorse complains that TDCJ-CID's policies do not allow "equal access to services" for inmates confined in administrative segregation.  According to the TDCJ-CID Inmate Orientation Handbook, administrative segregation is a classification for offenders who must be separated from the general population because they are dangerous to other offenders or to staff, or because they are in danger from other offenders.  Those inmates in administrative segregation may have a chaplain or volunteer visit.

The Constitution requires that inmates be given a "reasonable opportunity" to practice their religion.  <u>Pedraza v. Meyer</u>, 919 F.2d 317. 320 (5th Cir. 1990).  Thunderhorse has failed to show that he has been denied such an opportunity by reason of his confinement in segregation.  As noted above, TDCJ policy allows him to possess numerous sacred objects and to have a religious chaplain or volunteer visit; Thunderhorse does not indicate that he has sought to avail himself of such visitation opportunities and has been denied.  It is clear that Thunderhorse has access to research and other materials, presumably including religious materials; he has written and published numerous articles, including the Metacomet-Mattabesett Trail Study, written in March of 2004 and reprinted on the website of the Algonquian Confederacy of the Quinnipiac Tribal Council (ACQTC) (http://acqtc.com/branford040326.php), articles for the ACQTC newsletter, and at least one book as well as various articles on shamanism.  *See* Thunderhorse & Le Vie, <u>Return of the Thunderbeings</u> (Bear & Co., 1990).

The TDCJ policies prohibiting access to communal services for inmates in segregation are related to the compelling state interest of maintaining security, in that inmates in administrative

28

segregation are placed there because they pose a danger to others or are in danger from others. Thunderhorse has adequate alternative means to practice his religion through private worship in his cell, including possession of religious artifacts and literature, and through the opportunity to receive religious visitors. *See* Pedraza, 919 F.2d at 320.  This claim is without merit.        VII. Failure to Honor Prior Agreements

Thunderhorse contends that he had entered into a series of agreements with TDCJ regarding his faith, which he asserts are not being kept, although he offers no evidence of any of these agreements.  Thunderhorse's pleadings indicate that these agreements were arrived at through litigation; he cites a case which he filed with the help of an ACLU attorney named Patrick Wiseman in the Western District of Texas, which he says resulted in the "third out-of-court settlement."

The cause number for the lawsuit filed by Wiseman on Thunderhorse's behalf is 1:95cv222 (W.D.Tex.).  A review of the docket in this cause shows no evidence of a settlement agreement; rather, the record shows that on September 9, 1997, Magistrate Judge Alan Albright entered a Report recommending that the defendants' motion for summary judgment be granted as to the prison grooming policies and that the claim of denial of access to religious publications be transferred to the U.S. District Court for the Southern District of Texas.  This recommendation was adopted over the plaintiffs' objections.  Following this transfer, Thunderhorse's claims were dismissed with prejudice on March 2, 1998.  Neither the Western District nor the Southern District made any mention of a settlement agreement.

Even assuming that any settlement agreements existed, however, Thunderhorse has failed to show that these agreements are enforceable by this Court.  The Supreme Court has held that enforcement of a settlement agreement, whether through damages or a decree of specific enforcement, is more than just a continuation or renewal of the dismissed lawsuit, and hence requires its own basis for jurisdiction; however, the mere claim of breach of a prior settlement agreement is insufficient in and of itself to confer federal court jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 378, 114 S.Ct. 1673, 1676-77 (1994).  The Supreme Court rejected the

theory that the doctrine of ancillary jurisdiction provided a basis for federal court jurisdiction over such claims, although stating that the terms of the dismissal order itself could allow the court to retain jurisdiction over the settlement contract.   Kokkonen, 511 U.S. at 381, 114 S.Ct. at 1677; accord, Langley v. Jackson State University, 14 F.3d 1070, 1074 (5th Cir. 1994).

In this case, even if these settlement agreements exist, Thunderhorse has not shown any basis for his contention that this Court should enforce these agreements, nor does it appear that the Court would have jurisdiction to enforce settlement agreements entered into with other federal district courts in the State of Texas.   In effect, the settlement agreement becomes a contract between the parties, which may give rise to a breach-of-contract action in state court but fails to accord any basis of jurisdiction in federal court.   Hospitality House Inc. v. Gilbert, 298 F.3d 424, 431 (5th Cir. 2002), citing Kokkonen, 511 U.S. at 381-82, 114 S.Ct. at 1677.   His claim on this point fails for want of jurisdiction.

Other Claims

### VIII. Treaty Allegations

Thunderhorse claims that his rights under various other treaties and laws, including the Indian Civil Rights Act (25 U.S.C. 1301 et seq.), U.S. treaty law, the Universal Declaration of Human Rights, and the United Nations Covenant on Civil and Political Rights, have been violated.   The Indian Civil Rights Act provides that in exercising powers of self-government, Indian tribes may not take certain actions, corresponding to the guarantees of individual liberties set out in the Bill of Rights (25 U.S.C. 1302) and provides that the writ of habeas corpus shall be available to test the legality of detention by order of an Indian tribe (25 U.S.C. 1303).   The courts have held that the Act is not an affirmative declaration of rights, but is negative in form and forbids certain tribal actions. Spotted Eagle v. The Blackfeet Tribe of the Blackfeet Indian Reservation, City of Browning, 301 F.Supp. 85, 89 (D.Mont. 1969).   Because Thunderhorse is not challenging a tribal action, this Act is inapplicable to his case.

30

Next, Thunderhorse raises the issue of treaty law, but fails to show that any treaties exist between the United States and the Quinnipiac tribe under which he may make a claim of right. *See* Kappler, Indian Affairs: Laws and Treaties, available on-line at http://digital.library.okstate.edu/ kappler/index.htm (containing no mention of any treaties with the Quinnipiac Indians). Thunderhorse's invocation of treaty rights, lacking any evidence that a treaty with his tribe exists, is without merit.

Nor has Thunderhorse shown that any treaties with any of the other tribes making up the Algonquin Family of Nations afford him any protected rights. He invokes a document called the International Indian Treaty Council's Declaration of the Spiritual Rights of Native American Prisoners, but does not show that this document has any binding effect or that he has standing to bring claims under it.[4] Finally, Thunderhorse raises claims under the Universal Declaration of Human Rights and the United Nations Covenant on Civil and Political Rights. These documents are addressed to the obligations of governments and do not confer standing on individual plaintiffs to bring suit. Dickens v. Lewis, 750 F.2d 1251, 1254 (5th Cir. 1984); Diggs v. Richardson, 555 F.2d 848, 850 (D.C.Cir. 1976). Thunderhorse's claims under these charters is without merit.

In a similar vein, Thunderhorse asserts that TDCJ-CID policies violate his "sovereign and autonomous cultural integrity" as well as that of his tribe, which he describes as a tribal confederation with 501(c)(3) status, in violation of Article I(3) and Section 8(3) of the Constitution as well as Article VI(2), relating to Indian treaties.

The motion to intervene by ACQTC and TUELN, the Traditional United Eastern Lenope Confederacy Nation was denied on September 1, 2005. As a non-attorney *pro se* plaintiff, Thunderhorse cannot represent these parties in litigation. Guajardo v. Luna, 432 F.2d 1324 (5th Cir. 1970). The fact that ACQTC is a Section 501(c)(3) corporation does not provide any special basis upon which to intervene in this lawsuit. Furthermore, the interest of these groups, as stated in the

_____

[4]The International Indian Treaty Council is a non-governmental organization with consultive status to the United Nations Economic and Social Council. *See* http://www. treatycouncil.org /about.htm.

motion to intervene which is written in Thunderhorse's handwriting, is the protection of the right to religious liberty of Thunderhorse, the Grand Sachem.  Because Thunderhorse has not shown that his right to religious liberty was violated, there is likewise no showing that any protected rights of the would-be intervenors was violated.  This is underscored by the fact that Thunderhorse has continued to write articles for the ACQTC newsletter and other organizations, thus allowing him a means by which to "preserve [our] language, religion, history and culture," as stated in the motion to intervene. This claim is without merit.

IX. Retaliation

Thunderhorse asserts throughout his complaint that he has been the victim of retaliation.  He says that all of the sacred items allowed for him during the past decade have been confiscated or destroyed or forced to be sent home, due to "vague and ambiguous changes and interpretations" which served as "official excuses to discriminate and retaliate."  Thunderhorse says that he has been subjected to acts of discrimination and retaliation, including: repeated disciplinary cases for violating grooming standards; harm and threats of harm by use of tear gas; destruction of handicap aids such as glasses and UV shields; and placement in administrative segregation.

The Fifth Circuit has held that a prisoner who asserts a retaliation claim must assert specific facts; conclusory allegations are not enough.  Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988).  The elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

The Fifth Circuit has cautioned as follows:

> The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The Court went on to explain that district courts must "carefully scrutinize" claims of retaliation in order to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves."  Woods, 60 F.3d at 1166; accord, Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform.").  As the Eighth Circuit explained, any other rule would allow a prisoner to openly flout prison regulations after filing a grievance and then bring a claim under Section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance.  Orebaugh, 910 F.3d at 528.

In this case, Thunderhorse simply alleges that events not to his liking have occurred recently, and concludes that these must have been the result of retaliation.  He does not offer a chronology of events from which retaliation may plausibly be inferred; his contention that his past legal battles with TDCJ-CID have led to the implementation of policies which he considers unfavorable is simply too tenuous to support a claim of retaliation.  Inmates cannot bring legal action against TDCJ and then forever after claim that any adverse actions by prison officials were necessarily motivated by retaliatory intent from the prior legal action. Orebaugh, 910 F.2d at 528; Woods, 60 F.3d at 1166 (noting that inmates must produce either direct evidence of retaliation or a chronology of events from which retaliation may *plausibly* be inferred (emphasis added).  Nor can Thunderhorse refuse to comply with TDCJ's grooming code and then claim that punishments imposed for this failure to groom were retaliatory in nature.  His retaliation claim is without merit.[5]

---

[5]This lawsuit does not incorporate Thunderhorse's claims for specific incidents of use of force through application of tear gas; he does not name any persons involved in such incidents as

X. Diet

Thunderhorse complains that he is being denied a special religious diet. However, at no point in his complaint or the response to the motion for summary judgment does he ever specify what this diet consists of. As a general rule, prison officials are not required to accommodate particularized dietary requests which impose an undue burden. Udey v. Kastner, 805 F.2d 1218, 1219 (5th Cir. 1986); Kahey v. Jones, 836 F.2d 948, 950 (5th Cir. 1988). The Religious Land Use and Institutionalized Persons Act does not change this precedent because prison officials are entitled to consider "cost and limited resources" under RLUIPA. Cutter, 125 S.Ct. at 2123. In the absence of any evidence of what his requested diet entails, Thunderhorse has not shown that its denial violates his constitutional rights. His claim on this point is without merit.

XI. Qualified Immunity

The Defendants assert that they are entitled to the defense of qualified immunity. However, Thunderhorse makes clear that he seeks only injunctive relief. The Fifth Circuit has held that qualified immunity is not a defense to claims for declaratory or injunctive relief. Yates v. Stalder, 217 F.3d 332, 333 n.2 (5th Cir. 2000). The defendants' claim to the defense of qualified immunity is without merit.

Conclusion

The Court has carefully examined the record in this cause, including the Plaintiff's complaint, amended complaint, and other documents, the Defendants' motion for summary judgment, the Plaintiff's response thereto, as well as the competent summary judgment evidence properly before the Court. Upon such review, the Court has determined that there are no disputed issues of material fact which appear in the competent summary judgment evidence and that the Defendants are entitled to judgment as a matter of law.   It is accordingly

---

defendants in the case, nor show that the named defendants in this lawsuit were responsible for such incidents. Any such claims which Thunderhorse may have regarding such specific incidents are not part of this lawsuit and are not affected by the dismissal thereof.

ORDERED that the motion for summary judgment filed by the Defendants Brad Livingston and Bill Pierce is hereby GRANTED.  It is further

ORDERED that the Plaintiff's claims against Livingston and Pierce are hereby DISMISSED with prejudice.  As stated in note 5, above, any claims which Thunderhorse may have concerning specific incidents of alleged use of excessive force are not part of this lawsuit and so the dismissal shall have no effect upon them.

So **ORDERED** and **SIGNED** this **13** day of **February, 2006.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE