IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| IRON THUNDERHORSE | § | |
| v. | § | CIVIL ACTION NO.  9:04cv222 |
| BILL PIERCE, ET AL. | § | |

## MEMORANDUM OPINION

The Plaintiff Iron Thunderhorse, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se,* filed this lawsuit under 42 U.S.C. §1983 and other federal laws complaining of alleged violations of his constitutional rights.  The lawsuit has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(c).

### The Allegations of the Complaint

Thunderhorse's original and amended complaints center around the issue of religious freedom.  After an extensive discussion of his long history fighting TDCJ-CID in court, Thunderhorse explains that he is a practitioner of Native American religion and refers to himself as a "shaman."  He states that the Native American religious program existing in TDCJ-CID, as it now stands, gives preferential treatment to "Christian-oriented" Native American beliefs while "disfavoring and excluding" traditionalist Native American ceremonial leaders known as shamans. He says that the Native American program fails to inform interested persons, including himself, what the program entails and what items are allowed to be possessed before the interested inmate submits an I-60 inmate request form declaring a religious preference.  Thunderhorse says that this is discriminatory because "mainstream Christians" are informed and know what to expect. Furthermore, he asserts, Native American programs within the prison are restricted to certain units, and inmates in administrative segregation are restricted from participating in the programs.

1

Thunderhorse himself is in administrative segregation, as a result of a disciplinary case which he received for assaulting an officer.

Next, Thunderhorse says that the current TDCJ-CID policy setting out Native American "holy days" is not neutral, but favors Plains Indians culture and excludes other regions.  He says that he requested a fair resolution in which one holy day for each of the seven cultural regions would be adopted, but that the Defendant Bill Pierce told him it was up to then-chaplain Ron Teel, and Teel said that only Pierce could approve it.

Thunderhorse reiterates that the restriction of Native American programs to only certain units violates the Establishment Clause.  He stated that he had been allowed a viable program while confined at the Stiles Unit, and to deny him one, at the Polunsky Unit, violates his right to practice his religion.

Thunderhorse goes on to say that TDCJ-CID "maintains a separate category" for shamanism, the practitioners of which are entitled to "nothing."  He says that he is an "acknowledged shaman, equivalent to a priest and ceremonial leader," and that he has been listed as a shaman on his prison travel card since 1978, but that TDCJ-CID's failure to develop a set of shamans' items and procedures is proof that the prison system has tried to get him to convert to its "Christian-Indian program" or do without.

Although the TDCJ policy on religious devotional items claims the availability of such items as feathers, headbands, medicine bag, and natural objects such as stones, shells, feathers, bone, tooth, and plants, Thunderhorse says, this is not done in practice.  He says that he used to have several multi-colored headbands, but that a new policy restricts these headbands to white only. Thunderhorse states that he asked for a copy of this new policy, but it has not been given to him. Thunderhorse contends that the Muslims are allowed to have multi-colored headgear, so the fact that he is not is discriminatory.

Thunderhorse states that medicine bags must come from an approved vendor.  He says that this is "sacrilegious" because medicine bags are to be handled only by shamans and medicine men,

not vendors.  Thunderhorse adds that the allowance of natural objects, kept in medicine bags, is left to the whims of unit wardens.  He says that he had a quartz crystal in his medicine bag since the 1980s, but it was confiscated by Warden Alford who determined, by only visual inspection, that it was just "a hunk of plastic."  Furthermore, Thunderhorse says, by policy medicine bags must be worn only in cells or to and from ceremonies, but that he wants to wear his medicine bag everywhere because "to remove it is to court death."

Thunderhorse complains that the TDCJ Religious Program Committee is staffed by Christian chaplains, and there are no Native American traditional elders or shamans on the committee.  He states that the Native American program, which he again complains is located only on certain units, gets only occasional ceremonies, as opposed to "frequent services" for mainstream religions.  He says that Shamans and Native American circle members are not allowed any feast days or celebrations, while mainstream religious groups have celebrations "on a weekly basis."  He points to such things as Bill Glass Ministry Revivals, Mike Barber Ministry Revivals, and KAIROS celebrations, which present everything from magicians to singing groups, motorcycle displays, comedians, and martial arts exhibits, which he claims have "nothing to do" with religious issues.  Thunderhorse says that he has formally suggested a plan allowing quarterly feast days celebrating the seasons, but to no avail.

Next, Thunderhorse says that Muslims, Orthodox Jews, and Orthodox Greeks in TDCJ are allowed special diets and foods in conjunction with holy day observances, but no such privileges are allowed for Native Americans.  He says that it is an "ancient tradition" to celebrate the four seasons with feasts including special foods.  Thunderhorse's complaint does not identify the special diet or foods which he is seeking.

Thunderhorse says that he is the person most responsible for the existence of a Native American program in TDCJ-CID, but that he is excluded from the program because the defendants have refused to develop "a similar but unique category" for shamans, and because TDCJ has created a "Christian-oriented program" to the exclusion of traditionalist shamans such as himself.  He says

that he is a "traditionalist Algonquian shaman" and as such has sacred duties, obligations, and responsibilities to perform for his clan, nation, and confederacy, which he does not specify; in any event, Thunderhorse says, these duties have all been "chilled" since 2004.  He says that the "shift" in TDCJ policies away from the three previous agreements which he says that he made with prison officials places a substantial burden on his "exercise of ancient traditions."

Between 2004 and 2005, Thunderhorse says, all of the sacred items allowed for him during the past decade have been confiscated or destroyed or forced to be sent home, due to "vague and ambiguous changes and interpretations" which served as "official excuses to discriminate and retaliate."  He says that he has been subjected to acts of discrimination and retaliation, including: repeated disciplinary cases for violating grooming standards; harm and threats of harm by use of tear gas; destruction of handicap aids such as glasses and UV shields; and placement in administrative segregation.  He says that he has submitted several proposals for informal resolution, which were all ignored.  He claims that he has suffered a denial of medical care and the discontinuance of medical passes.

Thunderhorse states that while some common intertribal beliefs do exist, a majority of Native American beliefs differ significantly between cultural regions.  He says that mainstream Christian religions differ significantly on many issues, but that they are not forced to worship together en masse.

Thunderhorse adds that TDCJ-CID policies now in existence represent a departure from prior accommodations made to him in violation of various United Nations treaties, and also violate the treaty rights between the Algonquin Family of Nations as well as the International Indian Treaty Council's Declaration of the Spiritual Rights of Native American Prisoners.  He says that he is a "direct descendant" of an autonomous confederation which "helped America establish its entire democratic political system."

Thunderhorse goes on to say that he has requested an exemption to the TDCJ-CID grooming code under RLUIPA and in consideration of previous out-of-court settlements.  He says that he was

4

never a security breach, even with long hair, because visual searches were possible and were done, and because TDCJ-CID had multiple photographs of him on file.  Thunderhorse argues that this distinguishes his case from Diaz v. Collins.

In summarizing his claims, Thunderhorse says that the key facts in his amended complaint are: (1) confiscation of religious items; (2) denial of religious items; (3) denial of programs for shamans; (4) denial of a racial category for "Native Americans"; (5) failure to provide exemptions or accommodations for the dress code and grooming code; (6) failure to allow equal access to services for inmates in segregation; and (7) failure to honor prior agreements which he entered into with prison officials.  He adds that TDCJ-CID's grooming policy deprives him of a RLUIPA-approved hair style and says that the prison's racial categorization system recognizes only Caucasian, Hispanic, and Negro races, excluding Native Americans.  He says that this deprives him of unspecified benefits he would otherwise have enjoyed.

## The Trial Before the Court

Thunderhorse sought only injunctive relief, and so the case was set for trial before the Court, which was conducted on April 1, 2008.  The trial proceedings commenced by the parties disputing about the exhibits being offered.  While there was no question that many of the exhibits may have contained hearsay, the Court overruled the objections to the exhibits.  Thunderhorse objected to the admission of a birth certificate, stating that it was not his, but the Defendants contended that the birth certificate was relevant because Thunderhorse was complaining that TDCJ lacked a racial category for Native Americans, but that issue was "moot" because the birth certificate purports to show that he is not Native American.  Thunderhorse's objection was overruled as well.

## I. Iron Thunderhorse

The first witness called at trial was the Plaintiff Iron Thunderhorse.  He testified that his birth name was William Coppola, but he had his name legally changed in 1989.  He stated that he was unclear as to his age, although he believed himself to be 64 years old; he said that "federal

documents" showed his birth date as 1944, but the birth certificate offered by the Defendants said 1950.[1]

Thunderhorse testified that his primary complaints concerned free exercise of religion, non-establishment of religion, and discrimination against Native Americans.  He said that his lawsuit was brought under the Religious Land Use and Institutionalized Persons Act (RLUIPA), and so he must show that the policies complained of imposed a "substantial burden."  He stated that TDCJ's grooming policies imposed a substantial burden upon the exercise of his religious faith, and the Defendants pointed out that the Fifth Circuit had upheld these policies, to which Thunderhorse replied that those cases were decided prior to the passage of RLUIPA.  He argued that the Texas prison officials could provide religious exemptions, observing that other prison systems, including the Federal Bureau of Prisons, do exactly that.

The Court pointed out that TDCJ does have programs for Native Americans, and Thunderhorse stated that a policy allowing inmates to perform religious activities in their cells is not a "program."  He presented a copy of an inter-office communication from Chaplain O'Brien, showing that in 1995, while Thunderhorse was at the Stiles Unit, prison officials brought a ceremonial pipe to him and allowed him to conduct a ceremony.  Thunderhorse stated that a box was brought to his cell containing a pipe, an abalone shell, and some herbs, and that this was done even while he was in administrative segregation.

Thunderhorse stated that during that time period, he was allowed to grow his hair while in segregation, although he had to cut it when he was released to general population.  He was allowed to have a colored headband.  After his hair was cut, he was allowed to keep his braids in the craft shop, and his property, including the braids, was sent to his wife when he was sent back to

---

[1]Autobiographical details given by Thunderhorse about himself in his book, Return of the Thunderbeings (Bear & Co., Santa Fe NM, 1980) indicate that 1950 is the correct date; he refers to a motorcycle journey which he took "in the late '60s, at the age of 18." Return of the Thunderbeings, p. 13.

segregation.  Thunderhorse stated that at that time, he had a number of items above and beyond the minimum required by the Native American program.

Thunderhorse said that his problems began when he was sent to the Polunsky Unit in August of 2004.  He was not in segregation at that time.  Thunderhorse stated that Warden Alford and Major Duff insulted him with childish name-calling at the Unit Classification Committee hearing after his arrival at the unit, and not long after that, his medicine bag was taken and a quartz crystal confiscated and destroyed.  Thunderhorse said that the medicine bag had a buckeye, the crystal, and some herbs, white cedar and sage, in it.  He explained that the crystal was two inches big and not sharpened, but that it was confiscated because the prison officials said that it was plastic; Thunderhorse questioned the relevance of this explanation, pointing out that the prison allows plastic rosary crosses.

Thunderhorse testified that a number of disabled inmates were transferred to the Polunsky Unit at about the same time that he was, and the unit was not ready for such an influx.  He indicates that he received some disciplinary cases and was sent to 11 Building for pre-hearing detention, and his religious property was taken and sent to his wife; however, he was not given any confiscation papers.[2]  His medicine bag was destroyed, however, and he talked to the chaplain and was allowed to get a new one, but could not get any quartz.  This bag was later destroyed in 2006, along with a number of other items which Thunderhorse possessed.  After this, Chaplain Rose brought him another medicine bag with a stone and some sage, and this is the bag he currently has.

While he was at the Wynne Unit, Thunderhorse stated, he was allowed to make his own ceremonial pipe and was able to do a morning and evening ceremony.  He said that this was part of an agreement which he had with Wayne Scott, the former Director of TDCJ-CID, and Debbie Lyles.  Under this agreement, Thunderhorse said, he cut his hair, and was allowed to keep the cut hair and to perform his pipe ceremonies.  He kept these privileges at the Stiles Unit, but lost them when he went to the Polunsky Unit.  Thunderhorse maintained that he never violated the agreement or abused

---

[2]Thunderhorse stated that he spoke to Warden Alford, who talked to the captain and had the disciplinary charges dismissed.

the privileges which he received in any way.  He said that he has pictures of himself while in prison, with long hair and a beard.

When asked by the Court what he wanted from the lawsuit, Thunderhorse said that TDCJ has 32 "faith codes," of which half are Christian.  Native Americans have one, which he said means "practice our way or else."  He said that he wants a code for shamanism, access to a musical instrument (a drum or flute), a colored headband, and a access to a pipe.  Thunderhorse stated that while Native Americans are allowed only white headbands, because TDCJ officials say that they are concerned about prisoners using colored headbands as gang symbols, other religious faiths are allowed multi-colored robes or bandannas with white and blue trim. Thunderhorse also complained that three of the four holidays allocated to Native Americans are "battle days" rather than true holy days, and said that he wants to celebrate the seasons, something that other religious faiths do.  He also stated that he wanted feast days.  For these feasts, Thunderhorse said that fish and wildlife would be preferable, but he would not wish to place a burden on the kitchen, and so chicken could be substituted for wild turkey.

Thunderhorse said that he knows of two other inmates who have submitted requests to be classified as Native American shamanists, but they were refused.  He estimated that one-fourth of all inmates who identify their religious preference as Native American would want to be shamanists. He said that Bill Pierce claimed that some inmates designate their religious faith as Native American just to get to smoke, but Thunderhorse said that this was incorrect because cigarettes are readily available, albeit unlawfully, within the prison.

Thunderhorse again referred to the prison faith code, pointing out that a religious faith calling itself the "Church of Jesus Christ Christian - Aryan" was recognized and asking why shamanism could not also be recognized. He says that according to Pierce, TDCJ has gone from 36 recognized faiths to 136, but it is not clear what the additional 100 are; in any event, Thunderhorse says, there is not one for shamanism.

As for the issue of his ethnicity, Thunderhorse said that there are Native Americans who neither practice the religion nor speak the language.  He complained that he cannot have a pipe or a colored headband, although he does have a bottle of white sage.  Thunderhorse said that TDCJ had four vendors of Native American supplies, but three are now defunct and the other one repeatedly gets orders wrong.  He says that prison officials want him to use the sage in a "smokeless ceremony."

On cross-examination, the Defendants referred to an organization called the Algonquian Confederacy of the Quinnipiac Tribal Council (ACQTC).  Thunderhorse explained that this was a non-profit organization chartered in the State of Connecticut, and said that it was a "business council," not a religious one.  He acknowledged that he had written virtually all of the information on the ACQTC website and that the address for its headquarters was his wife's home.  Thunderhorse said that his wife was the chief financial officer for ACQTC and that he was the "grand sachem" (chief), as well as a historian and linguist.

When asked how he was harmed by lack of recognition for shamanism in the TDCJ faith code, Thunderhorse explained that because shamanists are not recognized, they are not allowed to have certain items, including personal pipes, colored headbands, other shamanistic items such as drums or flutes, and appropriate holy days with feast days.  He said that Native Americans do not have "authoritative sources" spelling out the practice of their faith, and explained that not all Native Americans practice the same - there are seven regions with seven linguistic branches,  Thunderhorse conceded that the Indian tribe in which he claims membership, which he identifies as the Quinnipiac Indians, is not a federally recognized tribe as of yet, although he says that the application form seeking federal recognition has been submitted.

Returning to the issue of the birth certificate, the Defendants note that one of Thunderhorse's purported certificates lists his mother as an Indian, while the other lists her as "white."  Thunderhorse said that someone else had submitted one of the questioned certificates under his name and said that "this is a problem that he has gone through."  He testified that "he did not know what year he was born."

9

## II. Steve Young

The second witness called was inmate Steve Young, a former cellmate.  Young said that he was familiar with Thunderhorse's religion as Native American Shamanism and that he has discussed this religion with Thunderhorse, although he, Young, was not a shamanist.  He said that he had seen Thunderhorse with a medicine bag, long hair, and a bandanna, and stated that as far he knew, there was no Native American policy at TDCJ; he also stated that he had helped Thunderhorse, who has vision problems, get around, and that Thunderhorse was one of the first inmates interviewed by Special Master Vince Nathan as part of the Ruiz case.

## III. Dennis Collins

Collins testified that he had been in inmate in TDCJ for about six and a half years.  He said that he lived in the same section as Thunderhorse and had talked to Thunderhorse about his faith.  Collins said that he tried to change his own faith to Native American Shamanism, but was told that he would have to be "Native American Christian."  He filed a grievance about this, but it was never returned to him.

Collins stated that he received an inter-office communication from Chaplain Rose referring to "Native American Christian."  However, as the Court pointed out, the document did not make clear that the word "Christian" went with the words "Native American," or was just typed in proximity to them.

## IV. Sidney Byrd

Byrd testified that he had been in prison since 1999 and had never been housed on the same unit with Thunderhorse; however, he said that he knew of Thunderhorse through the "struggle for religious freedom." Byrd stated that he himself is a Native American spiritualist, a Cherokee, and that he was not raised on a reservation but has known about Native American religion  all of his life.  He said that he has never written to Thunderhorse, but that Thunderhorse has written to him.

Byrd stated that he has tried to practice Native American religion during the entire time he has been in prison, but has been unable to do so.  He said that he is familiar with "Native American

shamanism," saying that this refers to "traditional practices."  He added that Chaplain Teel had written to him about Thunderhorse, using "racial epithets."

Byrd noted that he is now in administrative segregation and said that there is no program for Native Americans, possibly referring to those inmates also confined in segregation.  Byrd had his hair up, but let it down to show the Court that it was well past his collar.  He explained that he received a "religious exemption" from the assistant warden at the unit where he is confined. On cross-examination, Byrd acknowledged that he had received a disciplinary case for failure to groom, but offered the opinion that counsel for the Defendants in this case had something to do with this fact.  He also pointed out that he had obviously been growing his hair for a considerable period of time for it to have reached that length.

### V. Ruth Thunderhorse

The plaintiff's wife Ruth Mahweeyeuh Thunderhorse testified that she has known him since 1994 and has been married since 2002.  She said that she has never been arrested and has never been in trouble with the law, and that she used to be a Christian missionary.

At present, she said, she serves as the chief financial officer for ACQTC.  In 2005, she filed a letter of intent with the Bureau of Indian Affairs, seeking recognition for the Quinnipiac  Indians.

Ruth Thunderhorse stated that she visited the Plaintiff at the Stiles Unit, at a time when he was not in administrative segregation.  When he was placed in segregation, his property was taken and sent to her.  This property included religious items, and Ruth said that the chaplain at the Stiles Unit had the religious items sent to him so that they could be returned to Thunderhorse.

Ruth testified that she had written a biography of  Thunderhorse, which was published in 2007.[3] She stated that she had not been raised in the Indian culture, but had been told that she was part-Indian, although her family "hid" it.  She did not begin exploring her own native roots until

---

[3]*See* Ruth Thunderhorse, <u>Following the Footprints of a Stone Giant - the Life and Times of Iron Thunderhorse</u> (Infinity Publishing Co., West Conshohocken PA, 2007).

moving to Arizona.  Ruth said that she was editing a magazine for which Thunderhorse had written an article, which is how she met him.

### VII. Ron Teel

Teel, a named Defendant in this lawsuit, testified that he was hired by TDCJ in 1998 and terminated in 2005.  He originally filed a *pro se* answer in the case saying that he was not the TDCJ Native American coordinator, but the answer filed on his behalf by the Attorney General said that he was.

Teel stated that he has Native American (Cherokee) ancestry himself, although he did not belong to any Cherokee organizations.  Thunderhorse offered into evidence a letter which Teel had written to Byrd, in which Teel referred to Thunderhorse as a "wanna-be" and a "crybaby."  Thunderhorse also offered a card which Teel had sent to him, wishing him a happy Thanksgiving and Columbus Day and saying "we think Italians rock."  Thunderhorse stated that he considered the card an insult, because in his view, Thanksgiving and Columbus Day are offensive to Native Americans and because the reference to Italians possibly related to the fact that Thunderhorse's father was Italian and not Indian.[4]

Teel testified that Native American ceremonies within the prison were set up by the Religious Practices Committee, and that he did not know who this committee consisted of.  He explained that when he was hired in 1998, the Native American directives were already in place.  Teel stated that he had received training from a pipe carrier named Two Bears, from the Pequod tribe, who taught him ways of carrying out ceremonies.

---

[4]As noted in the discussion concerning Thunderhorse's birth certificate, some prison officials hold the view that Thunderhorse does not have Native American ancestry.  A letter in Thunderhorse's parole file (Defendants' Exhibit No. 8) from an individual named Daniel Whitman, says that Thunderhorse is not a Native American; this letter also says that Thunderhorse was born in Italy and came to the United States at age five, which does not appear to comport with the birth certificate which says that he was born in New Haven, Connecticut.  This question is not relevant to any issue in the lawsuit and so the Court does not purport to resolve it.

Thunderhorse stated that he had written Teel a letter about ceremonial items, and that Teel had responded that Thunderhorse should "get out and start his own circle."  Thunderhorse referred to a case called <u>Yellowquill v. Scott</u>, in which an individual named Jolene Yellowquill was allowed, as part of a settlement, to have a personal pipe.[5]

### VIII. Bill Pierce

Pierce testified that he was now the Director of Chaplaincy Operations at TDCJ, and he had been a regional chaplain before that.  He said that the director's position was an administrative and supervisory one, and that the majority of policies being administered were in effect in 2002.  Pierce stated that TDCJ had a "Religious Practices Committee" with representatives from different backgrounds, but he did not know if any of the members had a Native American background.

Pierce testified that he was familiar with the faith codes used by TDCJ, explaining that these codes were not for recognition but simply for record-keeping purposes.  He acknowledged that there was only one faith code for Native Americans.

A number of the codes were for various Christian denominations, and so Thunderhorse asked Pierce why half of the codes were for Christian groups but he could not add one more for Native American shamanism.  He also asked about the Church of Jesus Christ Christian - Aryan.  Pierce stated that if 15 people wanted a church, they could have one, but that Thunderhorse was the only inmate wanting Native American shamanism.  Thunderhorse said that requests had been sent to Pierce, apparently from other prisoners, wanting Native American shamanism, but these were returned with the word "shamanism" crossed out; Pierce said that he had not done this but that someone else must have.

Pierce stated that Thunderhorse could be listed as "Native American shamanist" on his travel card, but that in the chaplain's office, he would be listed only as "Native American." When asked why shamanism could not be included within Native American, Pierce stated that this had been done,

---

[5]*See* <u>Yellowquill v. Scott, et al.</u>, civil action no. 4:95cv1080 (S.D.Tex.).  The precise terms of the settlement do not appear on the docket or in the order of dismissal.

but Thunderhorse said that he had received no accommodations.  Thunderhorse explained that he wanted a hand drum or a whistle, but Pierce said that he had not received any request like that from him.  Thunderhorse insisted that he had sent three separate requests for Pierce for such items.

Documents were introduced into evidence, including a 2005 letter from Thunderhorse to Pierce that Pierce said he referred to the Attorney General because this lawsuit was pending, a letter from one chaplain to another in 1998 concerning Thunderhorse's shamanism, and a letter from 1995 from a chaplain saying that Thunderhorse had carried out a pipe ceremony without incident.

Thunderhorse contended that this last letter was proof that an agreement had existed at one time allowing him to perform pipe ceremonies.  Pierce said that he had nothing to do with any such agreement, and that he did not know if the letter showed the existence of an actual agreement or not.

Pierce conceded that Native American pow-wow ceremonies were done in other prisons.  He said that TDCJ had two Native American contract chaplains and that he had tried to contact tribes for assistance, but received no response.  Although Thunderhorse maintained that there were only four vendors of Native American supplies, Pierce said that there were more than that.

After a lengthy discussion of grooming codes, Thunderhorse returned to the question of the TDCJ faith codes.  Pierce said that at one time, there were 36 faith codes for different religious faiths, but now there are 135.  He explained that this increase occurred because more inmates were claiming to be members of different faiths.

Pierce went on to say that headbands were required to be of white cloth or natural leather.  Thunderhorse asserted that Muslims get multi-colored headgear, and Pierce said that this was not true, or that it should not be true if it was.  At one time, there were 302 inmates in TDCJ claiming to be adherents of Native American religions, but now there are about 3400.

With regard to pipe ceremonies, Pierce noted that tobacco is banned in prison except for the permitted Native American pipe ceremonies.  He said that inmates must be participating in the unit's Native American circle in order to partake of the pipe ceremony.  These ceremonies are done at 13 or 14 units, and all but one are managed by chaplains.  He noted that Native Americans were the only

14

inmates allowed to do things forbidden by policy; they could use tobacco in their pipe ceremonies, but Catholics could not use wine.

As to the question of holy days, Pierce said that prison officials go to outside resources, including persons who are leaders in their respective faiths.  He said that holy days in prison often mean a day off and possibly the chance to gather together, as Muslims do in celebration of Ramadan, but that inmates in administrative segregation are not permitted to do so.  He pointed out that inmates can request the designation of holy days, and the request will go to the Religious Practices Committee.  Thunderhorse complained that the Committee was made up of "mainstream Christians," and Pierce stated that there are two Native American chaplains and five Muslim chaplains.  He pointed out that there are "generic" worship services at which members of different Christian denominations worship together, and the members of the various sects of Islam and Judaism worship together.

Pierce stated that there are no feast days for Christians, asserting that Christmas is not a religious meal.  The Muslims get two feast days per year, and special food is brought in from outside.  The question of kosher food for Jewish inmates is currently in litigation.  He said that sometimes inmates lead services, but only with volunteers present.

Thunderhorse contended that Christian evangelists such as Mike Barber and Bill Glass are allowed to bring special programs into the prison.  He said that a Christian group called Kairos gives out cookies to inmates, even in segregation, and asked if a group is allowed to distribute cookies, why could a group not help inmates perform pipe ceremonies? Pierce replied that the prison did not tell volunteers what to do.

Thunderhorse again pointed to the Federal Bureau of Prison policies concerning Native American inmates, stating that under these policies, inmates in segregation could have pipe ceremonies and sweat lodges were allowed.  Pierce said that under TDCJ rules, sweat lodges are not permitted, but pipe ceremonies are allowed on certain units.  He added that some Native Americans refuse to go to pipe ceremonies because of a perception that there are "fakers" there, and

15

Thunderhorse acknowledged that this was true.  Pierce stated that TDCJ had less funding than the Federal Bureau of Prisons, as well as a shortage of officers.

Pierce stated that Thunderhorse could get a spiritual advisor to come visit him every month, and that all inmates had to be treated equally.  He said that as far as he knows, Thunderhorse is the only inmate claiming a faith of Native American shamanism, to which Thunderhorse replied that he was the only one pushing it, and that no other inmates knew that this faith was available.

IX. Daniel Rose

Thunderhorse said that Daniel Rose used to be the chaplain at the Polunsky Unit, and that Rose had put "Native American shamanist" on Thunderhorse's travel card.[6]  Rose also gave Thunderhorse a medicine bag, but Thunderhorse wanted a flute, which had been rejected by the warden, and a turtle shell.  Rose said that Thunderhorse did try to follow the rules, but the vendor made a mistake.

Rose said that Thunderhorse was the only person who had requested "Native American shamanism" as his faith.  He said that Thunderhorse's faith had been listed as "Native American" because there was no code for Native American shamanism, and that if Thunderhorse had insisted on Native American shamanism for his faith, it would have shown up on the computer as "other."  Consequently, Rose said, he listed Thunderhorse's faith as "Native American" so that Thunderhorse could have a medicine bag.

X. William Stephens

The final witness called at trial was William Stephens, the Region II Director.  Thunderhorse read the TDCJ grooming code into the record, and Stephens conceded that he did not know of any inmates receiving cases for not showering or brushing their teeth.  Thunderhorse argued based on this that only "certain portions" of the grooming code (i.e. those relating to hair) were enforced;

---

[6]Thunderhorse's current travel card reflects "Native American Shamanism" as his faith.

however, he acknowledged that he knew of instances in which inmates had been compelled to shower.

Thunderhorse said that there was an exemption to the grooming code, relating to medical issues - if inmates have a skin issue, they can wear beards.  He pointed out that TDCJ had multiple photographs of his and could identify him even if he cut his hair, but Stephens indicated that inmates could drastically change their appearances by cutting long hair or shaving off beards.

The Court asked Stephens about Byrd, who clearly had long hair.  Stephens stated that TDCJ had a shortage of about 3500 officers, and so some matters were overlooked.  He pointed out that Byrd "looked like a different person" when he let his hair down, and said that when an inmate name Carlos Kidd escaped, he was recaptured because of a photograph which the prison had put out.

Stephens said that inmates in administrative segregation could not go to pipe ceremonies, but Thunderhorse contended that he was not asking to go to a ceremony but to have them done in his cell.  Stephens said that TDCJ policy prohibited this because of complaints by other inmates, fire safety concerns, and the fact of having yet one more item to search.  He said that Thunderhorse could not have a ceremony outside because two guards would have to escort him, and the Coffield Unit alone had a shortage of 270 officers.  In addition, he stated that some inmates would try to manipulate the system to obtain combustible items.

Stephens testified that a balance had to be struck between religious beliefs and security issues.  He explained that items must be ordered from approved vendors because of contraband concerns.  Thunderhorse replied that the problem was one of availability, and Stephens said that this concern could be brought up with the Religious Practices Committee or through Pierce, the director of the chaplaincy program. Stephens noted that colored headbands represented a problem because gangs use colors to show affiliations, and that Thunderhorse could not be allowed to have a pipe ceremony in his cell because other inmates would want to be able to smoke in their cells too.

Stephens said that passing out cookies was different from holding religious ceremonies because of staffing and safety concerns.  He said that whistles, drums or flutes could be made into

17

weapons.  In addition, he said, the prison was already noisy, and such items can be made into weapons.  Stephens added that there would be no "automatic benefits" from creating a category for Native American shamanism, nor from creating a racial category for Native Americans.

Thunderhorse described the flute as being 12 inches of bamboo, which can be crushed with one hand.  He said that a pencil was more dangerous than the flute.  Stephens said that a flute could be made into a blow gun, which Thunderhorse disputed on the ground that a blow gun is longer.

Thunderhorse stated that he had various documents giving his ethnicity as white, Native American, Indian, and "other," but Stephens again said that there were no advantages to creating a racial category of Native American.  After finishing this line of questioning, the parties announced that there was no further evidence to offer at trial.

## Legal Standards and Analysis

This Court has previously expounded upon the central importance of religion in this country's history.  Diaz v. Collins, 872 F.Supp. 353, 356-57 (E.D.Tex., 1994, aff'd 114 F.3d 69 (5th Cir. 1997) (citing the 1786 Virginia Statute of Religious Liberty, James Madison's 1785 Memorial and Remonstrance on Religious Liberty, the 1776 Virginia Bill of Rights, the 1780 Massachusetts Bill of Rights, and the Northwest Ordinance of 1787).

The current law is codified in the Religious Land Use and Institutionalized Persons  Act of 2000 (RLUIPA), 42 U.S.C. §2000cc.  This law provides that no state or local government shall impose a substantial burden upon a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and does so by the least restrictive means.  This standard was carried over from RFRA, but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators."  146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

There are five cases which must be discussed with regard to the applicable legal standards.  These are: Cutter v. Wilkinson, 125 S.Ct. 2113 (2005); Longoria v. Dretke, 507 F.3d 898  (5th Cir.

2007); Adkins v. Kaspar, 393 F.3d 559 (5th Cir. 2004); Freeman v. TDCJ-CID, 369 F.3d 854 (2004); and Diaz v. Collins, 114 F.3d 69 (5th Cir. 1997).  In Cutter, members of various "non-mainstream" religions in the Ohio prison system brought suit under RLUIPA complaining that the prison officials failed to accommodate their religious exercises in various ways, including denying them access to religious literature, denying the same opportunities for group worship enjoyed by adherents of mainstream religious, forbidding them to adhere to dress and grooming requirements, withholding ceremonial objects substantially identical to those permitted to adherents of mainstream religions, and failing to provide chaplains trained in their faith.

In response, the prison officials mounted a facial challenge to RLUIPA, arguing *inter alia* that RLUIPA improperly advances religion in violation of the Establishment Clause.  The district court denied the defendants' motion to dismiss, but the Sixth Circuit reversed this decision, holding that RLUIPA violated the Establishment Clause by giving "greater protection to religious rights than to other constitutionally protected rights."  This decision was in turn reversed by the Supreme Court.

The Supreme Court began by tracing the history of congressional efforts to accord religious exercise heightened protection from government-imposed burdens.  Congress responded to the Court's decision in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990) by enacting the Religious Freedom Restoration Act (RFRA) of 1993.  The Court invalidated this law in City of Boerne v. Flores, 521 U.S. 507 (1997).  Congress then enacted the Religious Land Use and Institutionalized Persons Act.  This law provides that no state or local government shall impose a substantial burden upon a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and does so by the least restrictive means.  This standard was carried over from RFRA, but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators."  146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

In rejecting the Sixth Circuit's conclusion, the Supreme Court said first that RLUIPA is consistent with the Establishment Clause because it "alleviates exceptional government-created burdens on private religious exercise." Cutter, 125 S.Ct. at 2118.  The Court noted that individuals in institutions are dependent upon the government's permission and accommodation for exercise of their faith.

However, the Court then stated that "we do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."  The Court explained that while the Act adopts a "compelling governmental interest" standard, "context matters" in the application of this standard.  The Supreme Court said that lawmakers supporting RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions," quoting Sen. Hatch, and said that these lawmakers anticipated that courts would apply the Act's standard with "due deference to the expertise and experience of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of cost and limited resources." Cutter, 125 S.Ct. at 2123.

Finally, the Court concluded that should inmate requests for religious accommodations become excessive, impose unjustified burdens upon other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition. Cutter, 125 S.Ct. at 2125.

In Longoria, the plaintiff Juan Longoria, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit told him not to mutilate his hair.  He advised prison officials that he would not cut his hair due to his religious beliefs, and was told that an exemption could not be authorized for him under the grooming policy.   Longoria received disciplinary action for refusing to cut his hair.  He sued under RLUIPA, and the district court dismissed the lawsuit as frivolous, and the Fifth Circuit affirmed.

In Adkins v. Kaspar, inmate Donald Adkins was a member of a church called the Yahweh Evangelical Assembly.  He complained that he was not permitted to observe particular days of rest

20

and worship, each Saturday for the Sabbath and certain holy days during the year.  A hearing pursuant to <u>Flowers v. Phelps</u>, 956 F.2d 488, *modified in part on other grounds* 964 F.2d 400 (5th Cir. 1992) was conducted by the district court.

At the hearing, YEA elder Jerry Healan testified that the church required adherents to meet together on each Sabbath and to make particular observances on specific holy days.  He said that he went to the prison unit approximately once a month to oversee Sabbath services, but that the distances involved made more frequent trips impracticable.  Healan stated that 25 to 30 inmates at Coffield attended the services.  Healan stated that he and Adkins corresponded regularly and that Adkins had authored several articles which were published in the YEA newsletter and on the Internet.  Healan also said that he had been allowed to come to Coffield and conduct a baptismal ceremony for Adkins and other inmates.

Adkins testified that he had been granted lay-ins for holy days and the Sabbath, but that he and other YEA members could not assemble and hold services on their own.  He stated that he and other YEA members had been allowed to attend tape sessions and listen to tapes sent by Healan, but that they could only do this on Mondays; tape sessions could not be conducted on Saturdays unless an accredited religious volunteer was present.

Leonard Sanchez, the senior chaplain at the Coffield Unit, testified that YEA members could congregate on the Sabbath if Healan was present (Healan was the only accredited volunteer for YEA), and that if Healan could come more frequently, arrangements would be made for YEA members to congregate, conditioned on availability of space and time.  Another couple, the McEnanys, had not yet been accredited as YEA volunteers, but Sanchez said that when they were, they could lead YEA services on their own.

The district court concluded that the defendants had not denied Adkins a reasonable opportunity to practice his religion and that they had not burdened his religious exercise in violation of RLUIPA.  On appeal, the Fifth Circuit first examined Adkins' claim that TDCJ policies violated his right to free exercise of religion.

21

The Court reviewed the test of <u>Turner v. Safley</u>, 482 U.S. 78 (1987).  This case established a four-factor "rational relationship" test for analyzing the constitutionality of regulations that burden a prisoner's fundamental rights.  Under this test, courts must consider (1) whether a valid, rational connection exists between the prison regulations and the legitimate governmental interest put forth to justify it, (2) whether there exist alternative means of exercising the fundamental right which remain open to prison inmates, (3) what impact accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there is an absence of ready alternatives to the regulation in question.  <u>Adkins</u>, 393 F.3d at 564.

The Fifth Circuit noted that TDCJ's religious accommodation policy had been held to be rationally related to legitimate government objectives in <u>Freeman v. TDCJ</u>, 369 F.3d 854 (5th Cir. 2004).  In reviewing the second prong of the <u>Turner</u> test, the Fifth Circuit stated that the pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith.  In this regard, the Fifth Circuit stated that Adkins had access to religious materials, he and other YEA inmates were not required to work on the Sabbath, video and audio tapes were made available to YEA inmates on Mondays, and YEA members were permitted to hold services when Healan was able to attend.  The Fifth Circuit concluded that these accommodations were sufficient to accord Adkins and other YEA members alternative means to exercise their faith.

Next, the Fifth Circuit turned to the question of the impact which accommodation would have on guards, other inmates, and the allocation of resources generally.  The approximately 25 active members of YEA represented less than one percent of the population at the Coffield Unit; requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation" and have a negative impact on prison staff, inmates, and resources.  In addition, the Fifth

Circuit said, if YEA were accommodated but other small religious groups were not, a perception of favoritism could arise which would have a negative impact on prison discipline and morale.

The Court concluded the discussion of Adkins' free exercise claim by stating that there was no obvious, easy alternative which would accommodate both Adkins' and TDCJ's needs.  Adkins' request, that YEA members be allowed to congregate on all Sabbaths and holy days without regard for the availability of qualified volunteers or adequate space and security was not an alternative which accommodated the prisoner's rights at *de minimis* cost to legitimate prison interests, and the chaplain testified that the Assembly could meet more often if volunteers could be present and time and space were available.

The Fifth Circuit then addressed Adkins' equal protection claim, saying first that the Constitution does not require that every religious group in prison, however small in number, have identical facilities or personnel.  The Court stated that every religious group at Coffield, except for Muslims who have a separate court order, must have outside volunteers present for meetings.  Hence, Adkins had failed to show any equal protection violation.

Adkins also complained that TDCJ's policies violated RLUIPA.  The Fifth Circuit held that in RLUIPA claims, the plaintiff first has the burden of demonstrating that the governmental practice imposes a "substantial burden" on his religious exercises.  This requires the court to answer two questions: (1) is the burdened activity a "religious exercise," and (2) if so, whether the burden is "substantial."

The Fifth Circuit acknowledged that the term "religious exercise" in RLUIPA means any exercise of religion, whether or not compelled by or central to a system of religious belief.  The exercise alleged to be burdened, which was the YEA Sabbath and holy day gatherings, was clearly a "religious exercise" under this definition, requiring review of the second question, whether or not the burden was "substantial."

In answering this question, the Fifth Circuit first noted that the term "substantial burden" was not defined in the statute, and different circuits had defined the term differently.  After reviewing the

definitions adopted by the Seventh, Eighth, Ninth, and Eleventh Circuits, as well as pertinent Supreme Court decisions, the Fifth Circuit concluded that the proper definition was as follows:

> [F]or purposes of applying the RLUIPA in this circuit, a governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs.

> And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available non-trivial benefit, and, on the other hand, following his religious beliefs.

> On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

Adkins, 393 F.3d at 569-70.  The Court again emphasized that no test may require that the religious exercise be central to the adherent's belief system; however, the Court said, "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion."  In applying this test to Adkins, the Court said that the requirement that an outside volunteer lead worship services does not place a substantial burden upon Adkins' religious exercise, and therefore did not violate RLUIPA.  Adkins, 393 F.3d at 571.

In Freeman v. TDCJ, the plaintiff William Freeman joined the Church of Christ while in confinement at the Price Daniel Unit.  A chaplain named Wayne Horton, a Church of Christ Member, was assigned to that unit, but Freeman said that Horton's teachings departed from established Church of Christ doctrine.  Freeman filed a grievance complaining about Horton's performance and about a decision to reduce the two-hour Church of Christ services to an hour and a half.  This grievance asked that elders from a local Church of Christ congregation oversee services, that incarcerated members be permitted to conduct services without Horton's interference, and that the services be restored to two hours.  This grievance was denied but the dispute continued,

culminating in a walk-out by some 50 inmates from a service, for which Freeman received a disciplinary case and was transferred to a high-security unit.

Freeman filed a lawsuit and a class was certified.  This lawsuit complained that TDCJ was denying Church of Christ members an adequate opportunity to practice their faith.  The lawsuit sought an injunction ordering TDCJ to recognize the Church of Christ as a Christian religion separate and apart from other faiths, enjoin prison officials from violating Church of Christ members' right to worship, order prison officials to allow Church of Christ members to have an hour of separate worship time each Sunday according to tenets which the members believed essential to salvation, including a cappella singing and communion, order TDCJ officials to allow Church of Christ ministers and teachers from outside the prison to conduct individual Bible studies or assist with religious services, and order prison officials to allow these outside ministers and teachers to perform baptism by full immersion at an inmate's request.  Freeman also claimed that he individually was the victim of retaliation.

The evidence showed that TDCJ provides weekly religious services for what it considered to be the five major faith sub-groups within the prison.  These are Roman Catholic, Christian non-Catholic, Jewish, Muslim, and Native American.  The Church of Christ falls within the Christian non-Roman Catholic sub-group.

In addition, the evidence showed that supplemental devotional opportunities are offered for Church of Christ members.  In 41 TDCJ units, worship services are conducted by volunteers, who can often tailor the services to include a capella singing and communion; immersion baptism can be arranged for and performed by a Church of Christ minister at an inmate's request; and inmates may meet with an approved spiritual advisor twice a month.

The Fifth Circuit, applying the Turner test, concluded that TDCJ's policy was content-neutral and was rationally related to legitimate governmental objectives.  Specifically, the Court stated that staff and space limitations, as well as financial burdens, are valid penological interests.  The division of worship services into five major sub-groups was "eminently reasonable," and Church of Christ

inmates also had alternative means to exercise their beliefs.  The Fifth Circuit rejected the view that if TDCJ offered Church of Christ services in 41 units, it must offer such services in all units, and also rejected the equal protection argument set out by the plaintiff class.

Finally, the Fifth Circuit rejected Freeman's retaliation claim, noting that Freeman had engaged in a public rebuke of Chaplain Horton and incited a walkout, which behavior was inconsistent with his status as a prisoner; consequently, punishment imposed for that behavior was not unconstitutional retaliation.

In Diaz v. Collins, the Fifth Circuit reviewed a case from the Eastern District of Texas decided in 1994.  The plaintiff Felipe Diaz expressed himself as a follower of Native American beliefs and said that he wished to worship in traditional ways, including the use of pipes, the keeping of a medicine pouch, a headband, and the wearing of long hair.  The district court observed that in April of 1994, TDCJ had instituted a new policy specifically addressing the needs of Native American adherents in the prison.  Under this directive, the Native American adherents could possess a headband, a shell, a medicine pouch, seven sacred stones, a feather, and such other objects as may be permitted by the unit warden and unit chaplain.  The inmates had access to ceremonial items such as drums, pipes, tobacco, a gourd, sage, sweetgrass, and cedar, which were made available to them by the chaplain as required.  The regulations stipulated that items must be ordered from approved vendors, but stipulated that the medicine pouch could not be touched by any other person although it could only be worn in the cell.

The district court, after sketching the history of religious freedom in America, reviewed the Religious Freedom Restoration Act, the law in effect at that time.  The district court applied the Act to each of Diaz's claims in turn.

In so doing, the district court concluded first that TDCJ's hair regulations served the compelling governmental interest of security and were the least restrictive means available to further this interest.  Although Diaz complained that his religious beliefs did not allow him to obtain a medicine pouch from a commercial vendor, the evidence at trial showed that he would be permitted

to obtain such a pouch from his spiritual advisor, but that the pouch had to be sent through the warden's office and that Diaz had to allow it to be visually inspected for contraband. The district court concluded that these regulations, as well as the rule that Diaz could wear the pouch only in his cell, did not constitute a substantial burden on the exercise of his religion.

The evidence at trial showed that according to Glenda Taylor, who testified at Diaz's trial, the headband had more of a cultural than a religious significance. Diaz stated that the headband continually reminds the wearer of his duties to the Creator, to fellow humans, to his family, his community and himself, and likened the headband to ceremonial headgear worn by some Christians, Jews, and Muslims. The district court determined that headbands posed a potential security threat because of the possibility of concealing contraband, including weapons, and concluded that Diaz's rights were not violated by the requirement that he wear the headband only in his cell. The district court therefore concluded that to the extent that the prison regulations inhibited the free exercise of religion, they did so in furtherance of a compelling governmental interest and were narrowly tailored to meet this purpose. Diaz v. Collins, 872 F.Supp. 353 (E.D.Tex. 1994).

On appeal, the Fifth Circuit affirmed the district court's rulings on the medicine pouch and headband, explaining that Diaz had failed to prove that the prison regulations at issue substantially burdened his exercise of religion. Because Diaz was confined in administrative segregation, he was in his cell for some 22 hours per day, during which time he was allowed to wear his medicine pouch and headband. The Fifth Circuit also upheld the district court's conclusion regarding Diaz's hair, affirming the finding that a prison regulation on hair length involves a compelling state interest and did not violate RFRA.

The Fifth Circuit's holding in the Longoria decision relied heavily upon Diaz. The Court explained that although RFRA had been struck down, the compelling governmental interest/least restrictive means test was carried over from RFRA to RLUIPA. Because the test was essentially the same, the Longoria decision concluded that Diaz was dispositive of that case as well.

The Claims Raised by Thunderhorse

With these cases and the appropriate legal standards in mind, the Court will turn to the specific claims raised by Thunderhorse.  As set out in his amended complaint, these are: (1) confiscation of religious items; (2) denial of religious items; (3) denial of programs for shamans; (4) denial of a racial category for "Native Americans"; (5) failure to provide exemptions or accommodations for the dress code and grooming code; (6) failure to allow equal access to services for inmates in segregation; and (7) failure to honor prior agreements which he entered into with prison officials.

I & II. Confiscation and Denial of Religious Items

Thunderhorse says that he used to have several multi-colored headbands, but a new policy restricts these headbands to white only.  He testified that the Muslims are allowed to have multi-colored headgear so this is discriminatory, but Pierce testified that this was not true, and that Muslims were not permitted to have such headgear.

The testimony at trial shows that prison officials have a legitimate concern that colored headgear could be used as gang identification symbols.  In addition, a review of the evidence, including Thunderhorse's pleadings and testimony at trial, fails to show that the provision of a white headband rather than a multi-colored one influences Thunderhorse to act in a way that violates his religious beliefs, or forces him to choose between enjoying some generally available non-trivial benefit or following his religious beliefs.  *See* Adkins, 393 F.3d at 570.  In other words, Thunderhorse has not shown that this regulation "substantially burdens" his exercise of religious freedom, and the Defendants have proffered a legitimate basis for the regulation.  His claim on this point is without merit.

Similarly, Thunderhorse refers to an incident in which a warden confiscated a quartz crystal upon determination that the item was simply a piece of plastic.[7]  He says that he had possessed this

---

[7]Thunderhorse does not make clear if this is an accurate determination.

28

crystal for a number of years, and had a photograph of himself with the crystal around his neck. However, none of Thunderhorse's pleadings indicate that confiscation of the crystal amounted to a substantial burden upon his religious faith, nor that this confiscation was not done in accordance with TDCJ-CID policy.  As noted above, policy allows inmates to keep seven sacred stones, among other natural objects.  Instead, this claim appears to be one for the random and unauthorized confiscation of personal property.

The doctrine of <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy.  *See* <u>Caine v. Hardy</u>, 943 F.2d 1406, 1412 (5th Cir. 1991).  Three predeprivation conditions must exist before the doctrine can be applied.  These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized.  Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process.  <u>Charbonnet v. Lee</u>, 951 F.2d 638, 642 (5th Cir. 1992), *citing* <u>Zinermon v. Burch</u>, 494 U.S. 113 (1990); <u>Myers v. Klevenhagen</u>, 97 F.3d 91, 94-95 (5th Cir. 1996).

<u>Hudson</u> holds that deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists.  <u>Hudson</u>, 468 U.S. at 533.  The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy.  Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); *see also* <u>Murphy v. Collins</u>, 26 F.3d 541, 543-44 (5th Cir. 1994). Thus, the appropriate forum for this claim lies in state court or in the administrative procedures of

TDCJ rather than federal court.   Simmons v. Poppell, 837 F.2d 1243 (5th Cir. 1987). Thunderhorse's claim on this point is without merit.[8]

Thunderhorse further complains that he must get his medicine bag from an "approved vendor," which in his pleadings he says is "sacrilegious." This same requirement was addressed in Diaz, and the Fifth Circuit concluded that the policy did not on its face violate the Constitution.  In that case, the prison representatives agreed that Diaz could obtain a medicine bag from a non-approved vendor provided that it was sent through the unit warden's office and that he allowed visual inspections of the bag.  At trial, Thunderhorse acknowledged that he currently has a medicine bag, which was provided to him by Chaplain Rose.  He did not allege that this bag or the means by which he obtained it were "sacrilegious."  Thunderhorse's claim on this point is foreclosed by Diaz.

### III. Denial of Recognition of Native American Shamanism

Thunderhorse placed great emphasis on the fact that TDCJ recognizes some 136 religious faiths, but does not recognize Native American shamanism.  He noted that the prison system recognizes a faith called the Church of Jesus Christ Christian - Aryan.

The 1997 TDCJ faith codes list includes the Church of Jesus Christ Christian (Aryan Nations).  Although Pierce testified at trial that "this was not a racial group," this is patently incorrect.  That church by its own description believes in a doctrine called Christian Identity, which teaches, *inter alia.* that Adam was the father of the white race only, that the Jews are descended from Satan and are the enemy of the white Christian race, being "a parasite that attacks our racial body to destroy our great culture and the purity of our race," and that blacks are "two-legged beasts." *See* http://www.aryannations.org/; *see also* http://www.adl.org/ learn/ext_us/Aryan_Nations.asp.  The Church of Jesus Christ Christian, and the Christian Identity movement, is discussed in the FBI's Project Megiddo Report on Domestic Terrorism, which states as follows:

---

[8]In addition, the Court notes that while the size of the crystal is not specified, there is no question that a large stone (or piece of plastic) could putatively pose a security threat, particularly if, like many crystals, it was sharp or could be sharpened.

Nevertheless, Christian Identity is the most unifying theology for a number of these diverse groups and one widely adhered to by white supremacists. It is a belief system that provides its members with a religious basis for racism and an ideology that condones violence against non-Aryans. This doctrine allows believers to fuse religion with hate, conspiracy theories, and apocalyptic fear of the future. Christian Identity-inspired millennialism has a distinctly racist tinge in the belief that Armageddon will be a race war of Aryans against Jews and nonwhites.

*See* http://permanent.access.gpo.gov/lps3578/www.fbi.gov/library/megiddo/megiddo.pdf.

The Court can discern no rational basis in the prison officials' contention that an organization such as the Church of Jesus Christ Christian - Aryan Nations is accepted as a legitimate religious faith and designated with a faith code, but Native American shamanism cannot be.  In addition, while prison officials testified that Thunderhorse was the only Native American shamanic practitioner that they knew of, the Defendants' exhibits show that the number of adherents alone is not dispositive; the religious faith code list for March 31, 1996, lists a faith with *two* adherents (Druid) and another with *three* (Quaker), and on the December 31, 1997 list, there were *four* Quakers and *six* Druids, yet these belief systems had their own faith codes.  Thunderhorse's request for recognition of Native American shamanism is meritorious and should be granted; Native American shamanism should be recognized as a legitimate faith, with its own faith code, as a sub-set of Native American religion, in the same manner that Baptists, Presbyterians, and Methodists are recognized as legitimate faiths, with their own faith codes, as sub-sets of Christianity.

However, this does not mean that any special privileges will necessarily flow from such recognition.  As part of his shamanic faith, Thunderhorse said that he wanted access to a musical instrument, and TDCJ policies allow for such access, but only in connection with use in a pipe ceremony.  *See* TDCJ Chaplaincy Policy No. 9.01 (rev. 2).  This policy says that medicine bundles, used in pipe ceremonies, may contain a small clay flute for music, a small hand-held drum, and gourds and deer claw shakers for music and rhythm.  Because Thunderhorse is in administrative segregation, he does not have access to pipe ceremonies for security reasons, which reasons represent compelling governmental interests.  <u>Cutter</u>, 125 S.Ct. at 2123.  In the event that Thunderhorse is released from administrative segregation into the general prison population, he should be given

access to pipe ceremonies as well as approved musical instruments in accordance with TDCJ policies governing Native American practitioners who are housed in general population.  Thunderhorse's request that he be given access to a flute or drum thus lacks merit for so long as he is housed in administrative segregation.

To the extent that Thunderhorse complains that those services which are available to him in administrative segregation are geared toward Native American non-shamanists and are unsuitable for shamanists, his claim in this regard is similar to that in <u>Freeman</u>, in which the Church of Christ plaintiffs complained that the general Christian non-Catholic service was not suitable for them. However, their claim that they were entitled to a wholly separate service was rejected by the Fifth Circuit.  In this case, Thunderhorse has failed to show that he does not have a reasonable opportunity to practice his faith; rather, the evidence shows that the lack of services congruent with Thunderhorse's beliefs is due to the fact that Thunderhorse is confined in administrative segregation and to a lack of volunteers rather than any discriminatory purpose.

In a similar vein, Thunderhorse complains that the TDCJ policy designating holy days for Native Americans are oriented toward the Plains Indian culture.  As noted above, TDCJ cannot reasonably be expected to differentiate between the holy days for all of the branches of Native American religion.   In addition, Thunderhorse has not shown that the fact that the holy days designated for Native Americans within TDCJ-CID are oriented towards Plains Indians places a substantial burden upon his religious practice.  He is in administrative segregation and so does not require lay-ins from work, and the evidence shows that inmates are permitted to request additional holy days if they desire. As was the case in <u>Freeman</u>, Thunderhorse's claims on this point are without merit.

## IV. Denial of a racial category for Native Americans

Thunderhorse complains that TDCJ does not recognize "Native American" as a racial category, thus depriving him of benefits which he could otherwise obtain.  The prison officials respond that Thunderhorse could not benefit from such a category because the tribe in which he

Case 9:04-cv-00222-ZJH   Document 186   Filed 07/30/08   Page 33 of 42 PageID #: 2769

claims membership, the Quinnipiac Indians, is not federally recognized. Thunderhorse asserts that the tribe's application for federal recognition is currently pending.

Thunderhorse does not identify any benefits of which he claims to have been deprived, nor any harms which he has suffered, as a result of the fact that TDCJ-CID does not have a racial category for Native Americans. For example, there is no indication in the record that TDCJ has or enforces a policy limiting participation in Native American ceremonies to persons with provable Native American ancestry.[9] Thunderhorse has not shown any basis for relief on this point and so this claim is without merit.

### V. Exemptions to the Dress Code and Grooming Code

The parties spent a considerable period of time at trial discussing the TDCJ grooming code. While the Court does not dispute that the wearing of long hair is important to practitioners of Native American religions,[10] this is an issue which has been settled by the Fifth Circuit. In <u>Longoria v. Dretke</u>, 507 F.3d 898, 904 (5th Cir. 2007), the Fifth Circuit upheld the dismissal of an inmate's challenge to the TDCJ grooming code based on religious reasons. This Court is bound by the Fifth Circuit's decision in this regard, and so Thunderhorse's claim on this point is without merit.

To the extent that Thunderhorse complains that he cannot wear his headband or medicine pouch outside of his cell, this claim is without merit. The evidence before the Court includes an affidavit from Nathaniel Quarterman, now the Director of TDCJ-CID, which points out that TDCJ has a security concern regarding the presence of gangs, who often use clothing or insignia to identify members; for this reason, such items as Kufi caps worn by Muslims or medicine bags and headbands worn by Native Americans may only be worn inside of cells or during religious services. In addition, the plaintiff in <u>Diaz</u> challenged the requirement that the headband and medicine pouch could only

---

[9]The Fourth Circuit has held such a policy to be unconstitutional. <u>Morrison v. Garraghty, 239 F.3d 648</u> (4th Cir. 2001).

[10]<i>See, e.g.</i>, <u>Diaz v. Collins</u>, 114 F.3d 69, 72-73 (5th Cir. 1997); <i>accord</i>, <u>Teterud v. Burns</u>, 522 F.2d 357, 359-60 (8th Cir. 1975); R. Thunderhorse, <u>Following the Footprints of a Stone Giant</u>, pp. 87-88.

be possessed inside his cell, but the dismissal of this claim was affirmed by the Fifth Circuit.  <u>Diaz</u>, 114 F.3d at 73.  Thunderhorse's claim on this point is without merit.

VI. Access to Services in Segregation

In his complaint, Thunderhorse asserts that TDCJ-CID's policies do not allow "equal access to services" for inmates confined in administrative segregation.  According to the TDCJ-CID Inmate Orientation Handbook, administrative segregation is a classification for offenders who must be separated from the general population because they are dangerous to other offenders or to staff, or because they are in danger from other offenders.  Those inmates in administrative segregation may have a chaplain or volunteer visit.

The Constitution requires that inmates be given a "reasonable opportunity" to practice their religion.  <u>Pedraza v. Meyer</u>, 919 F.2d 317. 320 (5th Cir. 1990).  Thunderhorse has failed to show that he has been denied such an opportunity by reason of his confinement in segregation.  As noted above, TDCJ policy allows him to possess numerous sacred objects and to have a religious chaplain or volunteer visit; Thunderhorse does not indicate that he has sought to avail himself of such visitation opportunities and has been denied.  It is clear that Thunderhorse has access to research and other materials, presumably including religious materials; he has written and published numerous articles, including the Metacomet-Mattabesett Trail Study, written in March of 2004 and reprinted on the website of the Algonquian Confederacy of the Quinnipiac Tribal Council (ACQTC) (http://acqtc.com/branford040326.php), articles for the ACQTC newsletter as well as a number of other publications, and at least one book as well as various articles on shamanism.  *See* Thunderhorse & Le Vie, <u>Return of the Thunderbeings</u> (Bear & Co., 1990).

The TDCJ policies prohibiting access to communal services for inmates in segregation are related to the compelling state interest of maintaining security, in that inmates in administrative segregation are placed there because they pose a danger to others or are in danger from others.  Thunderhorse has adequate alternative means to practice his religion through private worship in his

34

cell, including possession of religious artifacts and literature, and through the opportunity to receive religious visitors.  *See* Pedraza, 919 F.2d at 320.  This claim is without merit.

### VII. Failure to Honor Prior Agreements

Thunderhorse contends that he had entered into a series of agreements with TDCJ regarding his faith, which he asserts are not being kept, although he offers no evidence of any of these agreements.  Thunderhorse's pleadings indicate that these agreements were arrived at through litigation; he cites a case which he filed with the help of an ACLU attorney named Patrick Wiseman in the Western District of Texas, which he says resulted in the "third out-of-court settlement."

The cause number for the lawsuit filed by Wiseman on Thunderhorse's behalf is 1:95cv222 (W.D.Tex.).  A review of the docket in this cause shows no evidence of a settlement agreement; rather, the record shows that on September 9, 1997, Magistrate Judge Alan Albright entered a Report recommending that the defendants' motion for summary judgment be granted as to the prison grooming policies and that the claim of denial of access to religious publications be transferred to the U.S. District Court for the Southern District of Texas.  This recommendation was adopted over the plaintiffs' objections.  Following this transfer, Thunderhorse's claims were dismissed with prejudice on March 2, 1998.  Neither the Western District nor the Southern District made any mention of a settlement agreement.

Even assuming that any settlement agreements existed, however, Thunderhorse has failed to show that these agreements are enforceable by this Court.  The Supreme Court has held that enforcement of a settlement agreement, whether through damages or a decree of specific enforcement, is more than just a continuation or renewal of the dismissed lawsuit, and hence requires its own basis for jurisdiction; however, the mere claim of breach of a prior settlement agreement is insufficient in and of itself to confer federal court jurisdiction.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 378, 114 S.Ct. 1673, 1676-77 (1994).  The Supreme Court rejected the theory that the doctrine of ancillary jurisdiction provided a basis for federal court jurisdiction over

such claims, although stating that the terms of the dismissal order itself could allow the court to retain jurisdiction over the settlement contract.  <u>Kokkonen</u>, 511 U.S. at 381, 114 S.Ct. at 1677; *accord*, <u>Langley v. Jackson State University</u>, 14 F.3d 1070, 1074 (5th Cir. 1994).

In this case, even if these settlement agreements exist, Thunderhorse has not shown any basis for his contention that this Court should enforce these agreements, nor does it appear that the Court would have jurisdiction to enforce settlement agreements entered into with other federal district courts in the State of Texas.  In effect, the settlement agreement becomes a contract between the parties, which may give rise to a breach-of-contract action in state court but fails to accord any basis of jurisdiction in a federal court other than the one in which the settlement agreement was reached.  <u>Hospitality House Inc. v. Gilbert</u>, 298 F.3d 424, 431 (5th Cir. 2002), *citing* <u>Kokkonen</u>, 511 U.S. at 381-82, 114 S.Ct. at 1677.[11]  His claim on this point fails for want of jurisdiction.

Other Claims

VIII. Treaty Allegations

Thunderhorse claims that his rights under various other treaties and laws, including the Indian Civil Rights Act (25 U.S.C. 1301 *et seq.*), U.S. treaty law, the Universal Declaration of Human Rights, and the United Nations Covenant on Civil and Political Rights, have been violated.  The Indian Civil Rights Act provides that in exercising powers of self-government, Indian tribes may not take certain actions, corresponding to the guarantees of individual liberties set out in the Bill of Rights (25 U.S.C. 1302) and provides that the writ of habeas corpus shall be available to test the legality of detention by order of an Indian tribe (25 U.S.C. 1303).  The courts have held that the Act

---

[11]The Fifth Circuit has held that federal courts have the inherent power to enforce settlement agreements entered into by the parties in a case pending before it, to determine compliance with procedural prerequisites, and to determine when, if ever, a party may repudiate a contractually binding settlement agreement.  <u>White Farm Equipment Co. v. Kupcho</u>, 792 F.2d 526, 529 and n.4 (5th Cir. 1986); <u>Mid-South Towing Co. v. Har-Win, Inc.</u>, 733 F.2d 386, 389 (5th Cir. 1984).  The district court has the power to enforce *summarily* a settlement agreement reached in a case pending before it.  <u>Mid-South Towing</u>, 733 F.2d at 389 (emphasis added).  Such enforcement may be done without regard to what the result might have been had the parties chosen to litigate.  <u>Terrain Enterprises v. Western Casualty and Surety Co.</u>, 774 F.2d 1320, 1321 (5th Cir. 1985).  The cases in which Thunderhorse claims that settlements were reached were not pending before or decided by this Court, and so this Court is not the appropriate forum in which to enforce such settlements.

36

is not an affirmative declaration of rights, but is negative in form and forbids certain tribal actions. Spotted Eagle v. The Blackfeet Tribe of the Blackfeet Indian Reservation, City of Browning, 301 F.Supp. 85, 89 (D.Mont. 1969).  Because Thunderhorse is not challenging a tribal action, this Act is inapplicable to his case.

Next, Thunderhorse raises the issue of treaty law, but fails to show that any treaties exist between the United States and the Quinnipiac tribe under which he may make a claim of right.  *See* Kappler, Indian Affairs: Laws and Treaties, available on-line at http://digital.library.okstate.edu/ kappler/index.htm (containing no mention of any treaties with the Quinnipiac Indians). Thunderhorse's invocation of treaty rights, lacking any evidence that a treaty with his tribe exists, is without merit.

Nor has Thunderhorse shown that any treaties with any of the other tribes making up the Algonquin Family of Nations afford him any protected rights.  He invokes a document called the International Indian Treaty Council's Declaration of the Spiritual Rights of Native American Prisoners, but does not show that this document has any binding effect or that he has standing to bring claims under it.[12]  Finally, Thunderhorse raises claims under the Universal Declaration of Human Rights and the United Nations Covenant on Civil and Political Rights.  These documents are addressed to the obligations of governments and do not confer standing on individual plaintiffs to bring suit.  Dickens v. Lewis, 750 F.2d 1251, 1254 (5th Cir. 1984); Diggs v. Richardson, 555 F.2d 848, 850 (5th Cir. 1984).  Thunderhorse's claims under these charters is without merit.

In a similar vein, Thunderhorse asserts that TDCJ-CID policies violate his "sovereign and autonomous cultural integrity" as well as that of his tribe, which he describes as a tribal confederation with 501(c)(3) status, in violation of Article I(3) and Section 8(3) of the Constitution as well as Article VI(2), relating to Indian treaties.

---

[12]The International Indian Treaty Council is a non-governmental organization with consultive status to the United Nations Economic and Social Council. *See* http://www. treatycouncil.org /about.htm.

37

The motion to intervene by ACQTC and TUELN, the Traditional United Eastern Lenope Confederacy Nation was denied on September 1, 2005. As a non-attorney *pro se* plaintiff, Thunderhorse cannot represent these parties in litigation. Guajardo v. Luna, 432 F.2d 1324 (5th Cir. 1970). The fact that ACQTC is a Section 501(c)(3) corporation does not provide any special basis upon which to intervene in this lawsuit. Furthermore, the interest of these groups, as stated in the motion to intervene which is written in Thunderhorse's handwriting, is the protection of the right to religious liberty of Thunderhorse, the Grand Sachem. Because Thunderhorse has not shown that his right to religious liberty was violated, there is likewise no showing that any protected rights of the would-be intervenors was violated. This is underscored by the fact that Thunderhorse has continued to write articles for the ACQTC newsletter and other organizations, thus allowing him a means by which to "preserve [our] language, religion, history and culture," as stated in the motion to intervene. This claim is without merit.

## IX. Retaliation

Thunderhorse asserts throughout his complaint that he has been the victim of retaliation. He says that all of the sacred items allowed for him during the past decade have been confiscated or destroyed or forced to be sent home, due to "vague and ambiguous changes and interpretations" which served as "official excuses to discriminate and retaliate." Thunderhorse says that he has been subjected to acts of discrimination and retaliation, including: repeated disciplinary cases for violating grooming standards; harm and threats of harm by use of tear gas; destruction of handicap aids such as glasses and UV shields; and placement in administrative segregation.

The Fifth Circuit has held that a prisoner who asserts a retaliation claim must assert specific facts; conclusory allegations are not enough. Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988). The elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred.

38

<u>Johnson v. Rodriguez</u>, 110 F.3d 299, 310 (5th Cir. 1997).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  <u>Johnson</u>, 110 F.3d at 310, *citing* <u>Woods v. Edwards</u>, 51 F.3d 577, 580 (5th Cir. 1995).

> The Fifth Circuit has cautioned as follows:

> The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

<u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995).  The Court went on to explain that district courts must "carefully scrutinize" claims of retaliation in order to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves."  <u>Woods</u>, 60 F.3d at 1166; *accord*, <u>Orebaugh v. Caspari</u>, 910 F.2d 526, 528 (8th Cir. 1990) (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform.").  As the Eighth Circuit explained, any other rule would allow a prisoner to openly flout prison regulations after filing a grievance and then bring a claim under Section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance.  <u>Orebaugh</u>, 910 F.3d at 528.

In this case, Thunderhorse simply alleges that events allegedly adverse to him have occurred recently, and concludes that these must have been the result of retaliation.  He does not offer a chronology of events from which retaliation may plausibly be inferred; his contention that his past legal battles with TDCJ-CID have led to the implementation of policies which he considers unfavorable is simply too tenuous to support a claim of retaliation.  Inmates cannot bring legal action against TDCJ and then forever after claim that any adverse actions by prison officials were necessarily motivated by retaliatory intent from the prior legal action. <u>Orebaugh</u>, 910 F.2d at 528; <u>Woods</u>, 60 F.3d at 1166 (noting that inmates must produce either direct evidence of retaliation or a chronology of events from which retaliation may *plausibly* be inferred) (emphasis added).  Nor can

Thunderhorse refuse to comply with TDCJ's grooming code and then claim that punishments imposed for this failure to groom were retaliatory in nature. His retaliation claim is without merit.[13]

### X. Diet

Thunderhorse complains that he is being denied a special religious diet. At trial, he referred to wanting a special diet for feast days, including fish and wild game, although he conceded that chicken could be substituted for wild turkey. As a general rule, prison officials are not required to accommodate particularized dietary requests which impose an undue burden. Udey v. Kastner, 805 F.2d 1218, 1219 (5th Cir. 1986); Kahey v. Jones, 836 F.2d 948, 950 (5th Cir. 1988). The Religious Land Use and Institutionalized Persons Act does not change this precedent because prison officials are entitled to consider "cost and limited resources" under RLUIPA. Cutter, 125 S.Ct. at 2123. For example, prison officials obviously would not be required to furnish freshly caught fish or wild turkey, but chicken would not appear to be an undue burden.

The TDCJ regulations specify that on ceremonial occasions, traditional foods may be requested and should be evaluated by the chaplain, food service manager, and warden on a case-by-case basis. See TDCJ Chaplaincy Manual, policy no. 9.01 (Defendants' Exhibit No. 2). At trial, Pierce testified that inmates could request the designation of specific holy days. Consistent with the recognition of Native American shamanism, Thunderhorse should be allowed to request a reasonable number of holy days and the provision of traditional foods in connection with such days, so long as the preparation of such foods does not constitute an undue burden, and the Court expects that approval of such requests, when made in accordance with standard TDCJ policies and regulations, will not be unreasonably withheld.

---

[13]This lawsuit does not incorporate Thunderhorse's claims for specific incidents of use of force through application of tear gas; he does not name any persons involved in such incidents as defendants in the case, nor show that the named defendants in this lawsuit were responsible for such incidents. Any such claims which Thunderhorse may have regarding such specific incidents are not part of this lawsuit and are not affected by the dismissal thereof.

### XI. Qualified Immunity

The Defendants assert that they are entitled to the defense of qualified immunity.  However, Thunderhorse makes clear that he seeks only injunctive relief.  The Fifth Circuit has held that qualified immunity is not a defense to claims for declaratory or injunctive relief.  Yates v. Stalder, 217 F.3d 332, 333 n.2 (5th Cir. 2000).  The defendants' claim to the defense of qualified immunity is without merit.

### Conclusion

In a trial before the bench, the Court must find the facts specially and make conclusions of law.  Rule 52(a), Fed. R. Civ. P.  This Rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence. Inwood Laboratories v. Ives Laboratories, 456 U.S. 844, 855 (1982).

The Court has carefully examined the record in this cause, including the Plaintiff's complaint and amended complaint, the documentary evidence submitted by the parties, and the testimony at trial.  Upon such examination, it is hereby

ORDERED that the Plaintiff's request for injunctive relief is GRANTED to the extent that the religious faith of "Native American shamanism" shall be recognized as a valid faith, within the ambit of Native American religion, and shall be given its own separate faith code.  All of the rights, privileges, and responsibilities which apply to Native American practitioners shall also apply to Native American shamanism practitioners.  Separate services for Native American shamanism shall not be required, although such services may be permissible when approved by prison officials and in conformity with content-neutral prison regulations, such as those requiring the presence of outside volunteers.  It is further

ORDERED that consistent with this recognition, the Plaintiff Iron Thunderhorse shall be permitted to request the designation of a reasonable number of holy days and to request traditional foods for feast days, in conformity with TDCJ regulations permitting inmates to make such requests. The request for traditional foods cannot be such as to impose an undue burden upon prison officials.

41

The Court expects that the approval of such requests, when made in the manner required by prison regulations, will not be unreasonably withheld.  It is further

ORDERED that in the event of the Plaintiff's release from administrative segregation into the general population, he shall be allowed to request access to pipe ceremonies and a medicine bundle, including musical instruments such as a clay flute and a small drum, as set out in TDCJ regulations permitting such ceremonies and medicine bundles.  The provision of such ceremonies and items shall not be required so long as Thunderhorse remains in administrative segregation.  As above, the Court expects that the approval of such requests, when made in the manner required by prison regulations, will not be unreasonably withheld.  It is further

ORDERED that any and all other relief sought by the Plaintiff Iron Thunderhorse is hereby DENIED.  Finally, it is

ORDERED that any and all motions which may be pending in this cause are hereby DENIED.

So **ORDERED** and **SIGNED** this **30** day of **July, 2008.**

JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

42